In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1391

FE A. VELASCO, M.D.,

Plaintiff-Appellant,

v.

ILLINOIS DEPARTMENT OF HUMAN SERVICES,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 4314--Suzanne B. Conlon, Judge.

Argued September 26, 2000--Decided April 12, 2001

Before COFFEY, RIPPLE, and ROVNER, Circuit Judges.

COFFEY, Circuit Judge. On June 30, 1999, Dr. Fe
A. Velasco, a Filipino-American woman, filed a
four-count complaint alleging that the Illinois
Department of Human Services' decision to
terminate her employment violated a number of
federal employment laws. Specifically, Velasco
asserted race and gender discrimination under
Title VII (Count One), race discrimination under
42 U.S.C. sec. 1981 (Count Two), retaliation
under Title VII and 42 U.S.C. sec. 1981 (Count
Three), and a violation of the Americans with
Disabilities Act (ADA) (Count Four). On August
16, 1999, the Illinois Department of Human
Services filed a motion to dismiss the first two
counts of Velasco's complaint, alleging that: (1)
Velasco's Title VII race and gender
discrimination claims (Count One) were untimely
as they were filed more than 90 days after she
received a right-to-sue letter; and (2) that the
Eleventh Amendment immunized the Department of
Human Services from Velasco's 42 U.S.C. sec. 1981
claims (Count Two). The district court granted
the defendant's motion and dismissed counts one
and two of Velasco's complaint. On December 3,
1999, the Department also moved for summary
judgment on counts three and four of Velasco's
complaint, contending: (1) that it had a
legitimate, nondiscriminatory reason for
discharging Velasco; and (2) that Velasco was not

a "qualified individual with a disability" under the ADA. The district court granted summary judgment to the Department with respect to counts three and four, and dismissed Velasco's complaint. We affirm.

I.  BACKGROUND
A.  Factual History

In 1986, the Illinois Department of Human Services hired Fe Velasco, M.D., as a forensic psychiatrist at the Elgin Mental Health Center (Elgin) to treat primarily those patients who either had been adjudged mentally incompetent to stand trial or had been acquitted of criminal charges by reason of insanity. On August 15, 1997, Velasco volunteered to be Elgin's Medical Officer of the Day (MOD) during the evening shift and was, therefore, the only physician on duty at Elgin from 4:00 p.m. until midnight. As the MOD, Velasco was responsible for attending to all medical emergencies at the facility.

That evening, at approximately 8:00 p.m., a patient in the Wines building began choking on food, and, at 8:04 p.m. a "Code Blue" alert was announced over Elgin's voice page system./1 Velasco, as the MOD, was obligated to respond immediately to the Code Blue and provide medical treatment to the patient. At the time of the Code Blue, she was sitting in the Elgin Medical Building, but claims that she did not hear the announcement./2 In any event, Velasco became aware of the emergency minutes later (at 8:08 p.m.) when her personal pager directed her to call an extension in the Wines Building. Upon calling, Velasco spoke with nurse Paul Bute and learned that he had performed the Heimlich maneuver (without success) on a choking patient. Despite being informed by Bute that the patient was gasping for air, Velasco did not immediately respond to the emergency, but instead asked Bute to "keep her updated on the situation" because "she was in the middle of her lunch."

Meanwhile, paramedics from St. Joseph's Hospital arrived at approximately 8:14 p.m. and left with the patient at approximately 8:25. p.m./3 Velasco, according to her own deposition testimony, was only a "five minute" walk away, but did not arrive at the Wines building until after the paramedics had departed with the patient, some twenty minutes after the Code Blue page was initially activated. Although the patient was released from St. Joseph's Hospital a few hours later that evening, Velasco did not actually visit the patient until 1:35 a.m. the next morning.

Dr. Stephen Dinwiddie, who as the Elgin Medical

Director supervises all medical professionals employed at Elgin, met with Velasco on Monday, August 18, 1997. During the meeting, Dr. Dinwiddie informed Velasco that he had ordered an internal investigation of the Code Blue incident referenced above. Dr. Dinwiddie further advised Velasco that if the investigation concluded that she did not provide a timely response to the choking patient, she should consider resigning rather than facing charges of neglect of duty which could result in termination of her employment. Almost one month later, on September 11, 1997, the Elgin internal investigation office submitted a report to Dr. Dinwiddie that stated:

There appears to be no dispute that Dr. Velasco was not present on the unit, and did not seek nor attend to the patient, from the beginning of the choking episode to the time of the transfer to St. Joseph's. Neither is this (her non-attendance) refuted in any of the statements completed by staff interviewed subsequent to the incident.

Based on this report, Dr. Dinwiddie sent a letter to Darek Williams, the Elgin Director of Human Resources, recommending that Velasco's employment be terminated. According to Dr. Dinwiddie's letter, his recommendation to discharge Dr. Velasco was based on the following:

That when "Dr. Velasco was called and told of the acute choking situation, she said that she was in the 'middle of dinner and to keep her updated.'"

That when "she arrived on the Unit after the patient had been transported . . . she wrote a note which has a date, but no time, thus potentially obscuring her role in this incident."

That the patient returned at 10:15 but that Dr. Velasco "did not examine the patient in person until" 1:35 a.m. the next morning, "according to her progress note."

Dr. Velasco's failure to respond to the emergency call that the patient was choking in a timely way.

Dr. Velasco had been disciplined twice for serious offenses, in particular and most recently, for failing to go to another patient who was exhibiting seizure symptoms.

Under the terms of a master agreement negotiated by the American Federation of State County and Municipal Employees (AFSCME), no Elgin employee could be disciplined or discharged without first being afforded a hearing allowing the employee the opportunity to rebut any charges

of wrongdoing. After reviewing Dr. Dinwiddie's report, Darek Williams scheduled a pre-disciplinary hearing for November 21, 1997, to consider whether Velasco's employment at Elgin should be terminated. Shortly before this pre-disciplinary hearing, however, an AFSCME representative contacted Williams and secured a continuance of the hearing because Velasco had been placed on medical leave.

Velasco was placed on medical leave on November 18, 1997, after calling Elgin's timekeeper and stating that she had checked into a hospital for depression./4 In support of Velasco's request for medical leave, on January 23, 1998, Dr. E.A. Perakis, a psychiatrist, submitted a letter to Elgin's human resources director stating that Velasco had been under his care since November 18, 1997, at which time he had advised her to take a medical leave of absence. Some months later, on May 12, 1998, Dr. Perakis submitted a letter stating:

Dr. Velasco has been under my care since November 18, 1997 and has been treated for symptoms of severe depression. During the past two years, she has struggled with poor concentration, decreased energy levels, tearfulness, and a severely depressed mood. She has not been able to function at a level which would enable her to practice psychiatry.

I do not feel that [Velasco] was in any condition to function adequately in her duties as a psychiatrist nor to function sufficiently while in any other kind of demanding job that would utilize her skill level. I would definitely consider the patient to have been totally disabled during this period.

Prior to Dr. Perakis' May 12, 1998 letter, no one at Elgin had been informed that Velasco had a disability which required accommodation. In fact, Dr. Velasco never completed a "Request for Reasonable Accommodation" form for her disability.

While Dr. Velasco applied for continuing medical leave, Dr. Edith Hartman became aware that Velasco's staff privileges would expire in August 1998./5 On July 8, 1998, Dr. Hartman wrote Velasco and warned:

Please be advised that your membership in the Medical Staff Organization, and your privileges as Physician Specialist C will expire on August 28, 1998.

In response, Velasco wrote a letter to Dr. Hartman on July 12, 1998, stating:

Thank you for your kind consideration. I am requesting the application for renewal of membership in the Medical Staff organization be sent to my residence as I am still medically unfit to return back to work.

One month later, on August 12, 1998, Velasco submitted an application to renew her staff privileges at Elgin. On the application, Velasco responded "No" to the question "Do you have any physical or mental condition which could impact on your ability to carry out any assigned duties?" despite the fact that she: (1) had admitted only a month before in her letter to Dr. Hartman that she was "medically unfit to return back to work"; and (2) was currently on medical leave. On August 20, 1998, the Credentials Committee allowed Velasco's staff privileges at Elgin to lapse because of her unresolved personnel and health issues.

On August 20, 1998, more than one year after the Code Blue incident occurred, Elgin management sent a notice to Velasco, stating:

Elgin Mental Health Center is contemplating imposing disciplinary action upon you. (See attached memo [alleging misconduct in handling the "Code Blue" emergency of August 15, 1997]) According to AFSCME Master Contract, you will have an opportunity in which to respond to these charges. Therefore a conference has been rescheduled for you on August 26, 1998 at 2:00 p.m. in Conference Room 113 of the Administration Building.

At the August 26 conference, you may be represented by your bargaining unit representative.

Velasco requested that the hearing, now scheduled more than one year after the incident, be delayed due to her continuing health problems, but her request was denied. On the date of the hearing, Dr. Dinwiddie appeared on behalf of Elgin management, recited the results of the internal investigation report, and argued for her discharge. As Velasco neither attended the hearing nor requested that an AFSCME official appear on her behalf, Dr. Dinwiddie's arguments and allegations went unchallenged and Velasco was discharged effective on October 25, 1998.

B.  Procedural History

Dr. Velasco originally filed charges with the Equal Employment Opportunity Commission (EEOC) and the Illinois Department of Human Rights (IDHR) alleging race and gender discrimination

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec.2000e, et seq., in March 1998. Shortly thereafter, on May 18, 1998, Velasco received a right-to-sue letter from the EEOC and IDHR. Almost two months later, on August 14, 1998, she filed a two-count complaint in federal court alleging race discrimination and Title VII gender discrimination. On January 26, 1999, Velasco moved (without reciting a reason) to voluntarily dismiss her first complaint pursuant to Fed. R. Civ. P. 41, and the trial judge granted her motion.

On February 22, 1998, only one month after dismissing her first complaint, Velasco filed new charges with the EEOC and IDHR alleging retaliation and disability discrimination, but not race discrimination. She received a right-to-sue letter dated April 28, 1999, in response to these charges. On June 30, 1999, Velasco filed her second complaint and alleged race and gender discrimination under Title VII despite the fact that she had not made an allegation of race discrimination in her February 1999 complaint to the EEOC and IDHR. Thus, the second complaint was filed over one year after the EEOC's May 1998 right-to-sue letter authorizing a suit based on race discrimination.

On August 16, 1999, the Department filed a motion to dismiss alleging that: (1) the race and gender discrimination under Title VII claims in Count One were filed more then 90 days after the right-to-sue letter was issued and were, therefore, untimely; and (2) that the Eleventh Amendment immunized the Department, an agency of the state of Illinois, from liability under 42 U.S.C. sec. 1981. The district court granted the defendant's motion and dismissed the Title VII race and gender discrimination claims in Count One and the section 1981 claims in Count Two.

On December 3, 1999, the Department moved for summary judgment on the remaining counts (alleging violation of the ADA and discriminatory retaliation) contending that: (1) the department had a legitimate nondiscriminatory reason for discharging Velasco; and (2) Velasco was not a "qualified individual with a disability" under the ADA. The district court granted the Department's motion on January 14, 2000, and dismissed Velasco's remaining claims. Velasco appeals.

II.  DISCUSSION

We review de novo the district court's decision to grant both a motion for summary judgment and a motion to dismiss, accepting all facts and inferences in a light most favorable to Velasco.

Vukadinovich v. Board of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993). Summary judgment is appropriate whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "If no reasonable jury could find for the party opposing the motion, it must be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A.  ADA Claim

   Whatever the merits of Velasco's ADA claim were before she filed her suit, the Supreme Court's recent decision in Board of Trustees of the Univ. of Alabama v. Garrett, 121 S. Ct. 955 (2001) bars her ADA claim under the Eleventh Amendment. We are, of course, bound to follow the holdings of our nation's highest court. United States v. Gillespie, 974 F.2d 796, 804 (7th Cir. 1992) ("[O]ur obligation is to follow Supreme Court precedent, not contract or expand it . . . ."). Given that the Garrett decision is directly on point, we need not address this issue any further.

B.  Title VII Retaliation Claim

   Dr. Velasco contends that the district court improperly granted summary judgment on her claim of retaliation under Title VII. On appeal, Dr. Velasco argues that a factual question exists as to whether she was terminated in retaliation for her decision to file charges of race and sex discrimination against the Illinois Department of Human Services. We disagree.

   As is well known, Title VII prohibits an employer from taking adverse employment action or discriminating against an employee merely because the employee

. . . has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this subchapter.

42 U.S.C. sec. 2000e-3(a). Thus, it is unlawful for an employer to discharge an employee simply because that employee has filed a charge under Title VII. Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992).

1. Burden-Shifting Analysis

Dr. Velasco employed the burden-shifting approach originally espoused in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) in resisting the Department's motion for summary judgment on her retaliation claim. In the present case, the Department concedes that Dr. Velasco can set forth a prima facie case that she engaged in protected activity by filing charges of discrimination with the EEOC, and shortly thereafter, suffered an adverse employment action, namely being discharged./6 Under McDonnell Douglas' indirect, burden-shifting approach, this concession forces the Department to articulate a nondiscriminatory reason for terminating Velasco's employment which, if taken as true, would support the conclusion that there did exist a nondiscriminatory reason for her discharge. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513 (1993). The Department asserts that Velasco was terminated because she failed to timely respond and supply medical attention during a life-threatening Code Blue emergency while serving as the Elgin MOD on August 15, 1997.

Importantly, we have recently decided that an employer that claims that a physician's actions have endangered patients has articulated a non-discriminatory explanation for discharge that satisfies this burden of production. Bekker v. Humana Health Plan, Inc., 229 F.3d 662 (7th Cir. 2000). As we are of the opinion that a doctor endangers persons entrusted to her care if and when she fails to timely respond to medical emergencies, we hold that the Department has satisfactorily articulated a non-discriminatory reason for terminating Velasco's employment.

As the Department has asserted a non-discriminatory justification, the burden now shifts to Dr. Velasco to prove by a preponderance of the evidence that the Department's proffered reason was merely a pretext for discrimination. To demonstrate pretext, Velasco must demonstrate that the Department's articulated reason for her discharge either: (1) has no basis in fact; (2) did not actually motivate her discharge; or (3) was insufficient to motivate her discharge. Collier v. Budd Co., 66 F.3d 886, 892 (7th Cir. 1995).

Upon review of the record, we are convinced that the Department's asserted reason for her discharge was supported by an adequate factual basis. It is undisputed that a medical emergency occurred on August 15, 1997, when a Code Blue

page announced an emergency in the Wines Building. It is further undisputed that another hospital employee, Jean Cattron, who was in the same building as Velasco at the time of the Code Blue call not only heard the call, but responded to the alert and assisted the patient prior to the arrival of paramedics. The record demonstrates that Velasco, by her own admission, did not arrive in the building until after paramedics had left with the patient. Finally, Velasco admits she advised a nurse attending to the patient during the life-threatening emergency that she was on her "lunch break." We also hold that Dr. Velasco has failed to demonstrate that her handling of the Code Blue incident did not "actually motivate" her discharge or was "insufficient to motivate" her discharge. Collier, 66 F.3d at 892.

Dr. Velasco asserts that the temporal proximity between the time she filed a charge of discrimination (September 2, 1997) and Dr. Dinwiddie's recommendation to terminate her employment (October 14, 1997) creates a question of fact as to whether the Department discharged her in retaliation for filing a discrimination claim. Dr. Velasco's reliance on the temporal proximity between her complaint and discharge is misplaced because Dr. Dinwiddie became concerned about Dr. Velasco's mishandling of the Code Blue incident well before Velasco filed a discrimination charge. In fact, on August 18, 1997, Dr. Dinwiddie told Velasco that she should consider resigning rather than proceeding through disciplinary proceedings that would likely result in her termination.

C.   Race Discrimination

Dr. Velasco's final argument is that the district court erred in dismissing her race discrimination claim as being untimely. A plaintiff must file an action for race discrimination within 90 days of receiving a right-to-sue letter. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990). Dr. Velasco received a right-to-sue letter on May 18, 1998, and timely filed her first complaint against the Department alleging race and gender discrimination under Title VII on August 14, 1998. On January 26, 1999, however, Velasco moved to voluntarily dismiss her first complaint pursuant to Fed. R. Civ. P. 41, and the court granted her motion.

When Velasco filed new charges with the EEOC on February 22, 1998, she alleged retaliation and disability discrimination, but did not re-assert charges of race discrimination. Consequently, the April 28, 1999 right-to-sue letter she received

in response to her February charges authorizes her to file a suit for "retaliation and disability discrimination" but not race discrimination. Thus, the only authorization Dr. Velasco has ever received to bring the claim of race discrimination contained in her second complaint was conferred on May 18, 1998, over one year prior to her filing of the second complaint. Her race discrimination count is clearly not timely. See generally Brown v. Hartshorene Pub. Sch. Dist. #1, 926 F.2d 959, 961 (10th Cir. 1991) ("Courts have specifically held that the filing of a complaint that is dismissed without prejudice does not toll the statutory filing period of Title VII. See Price v. Digital Equip. Corp., 846 F.2d 1026, 1027 (5th Cir. 1988) (per curiam); Wilson v. Grumman Ohio Corp., 815 F.2d 26, 28 (6th Cir. 1987) (per curiam). We agree.").

The district court's decision is

AFFIRMED.


/1 Code Blue is the highest, most urgent call used at the Elgin facility and signifies a life-threatening medical emergency. Elgin's "voice page system" is a series of loud speakers contained in almost every building at Elgin, including the Medical Building where Velasco was seated at the time that the Code Blue was announced.

/2 Jean Cattron, another Elgin employee, stated in a subsequent investigation that she (Cattron) was in the Medical Building and heard the Code Blue announced over the loud speakers.

/3 Dr. Velasco alleges that the paramedics transferred the patient at 8:15 p.m. not 8:25 p.m., but offers no support for this contention. More importantly, she does not dispute that the paramedics, arriving from a separate medical treatment facility, responded to the emergency and transferred the patient to St. Joseph's Hospital before she arrived on the scene.

/4 Due to Velasco's numerous requests, her medical leave was eventually extended through November 4, 1998, and she never returned to work at Elgin.

/5 "Staff Privileges" at a hospital allow a licensed doctor to practice medicine at a particular institution. As the Chair of the Elgin Credentials Committee during all times relevant to this appeal, Dr. Hartman reviewed requests from doctors to obtain or renew staff privileges at Elgin.

/6 To establish a prima facie case of retaliation under Title VII, Velasco must prove that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) there is a causal link between the protected expression and the adverse action. Adusumilli v. City of Chicago, 164 F.3d 353, 362 (7th Cir. 1998).