**Emmer J. ADAMS and Johnny G. Moore, Plaintiffs–Appellants,**

v.

**TRITON COLLEGE, Defendant– Appellee.**

No. 01–2872.

United States Court of Appeals, Seventh Circuit.

Argued March 5, 2002.

Decided April 29, 2002.

Before COFFEY, EASTERBROOK, and MANION, Circuit Judges.

## ORDER

Emmer J. Adams and Johnny G. Moore, both African–Americans, are former em-ployees of Triton College. In 1998 Triton created a new position for Adams and involuntarily transferred Moore from the position of Computer Systems Specialist to the position of Audio Visual Assistant. Adams and Moore filed a joint suit in the district court alleging that Triton had taken adverse employment actions against them and discriminated against them on the basis of their race in violation of 42 U.S.C. § 1981 and the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Adams also claimed that she had been discriminated against on the basis of her age and later voluntarily dismissed that count, thus it is not raised on appeal). The district court granted summary judgment to Triton, finding that Adams and Moore had failed to show that Triton's proffered reasons its actions were pretext for discrimination. Adams and Moore appeal the district court's decision. We affirm.

### 1. Adams

Emmer Adams began her employment at Triton in 1980. Over the years she held various positions, culminating in her promotion in 1995 to Associate Vice President of Affirmative Action and Human Resources. Adams considered her Associate Vice President job to be stressful, and she complained about the stress of her job on numerous occasions to Dr. George Jorndt, Triton's President, and to Roy McCampbell, Vice President of Business Services. In 1995 Triton hired Sean Sullivan to assist Adams as her Affirmative Action, Human Resource and Equal Opportunity Assistant. Adams and Sullivan did not get along and regularly complained about one another. (The record is not clear regarding the nature of their disagreements or complaints.) In 1997 Sullivan was promoted to Interim Executive Director of Marketing, making him Adams's supervisor. After Sullivan's promotion, Adams asked

for assistance in performing her job, but her request was denied.

In June 1998 Triton reorganized its Business Services Department, and Sullivan proposed to change Adams's job title to Associate Vice President of Affirmative Action and Business Services. Sullivan discussed the position with Adams and a submitted a job description for approval to Triton's Board of Trustees. While Adams did not object to the description of the new position before it was submitted to the Board, she alleges that Sullivan violated Triton's customary practice by not first submitting the job description to Adams and allowing her to submit it to the Board. Adams claims that Sullivan briefly showed her the description of the new position before submitting it to the Board, but did not give her a copy. The parties dispute the reason the new position was created for Adams. Triton asserts that Sullivan created and assigned Adams the new position, as well prepared a description of its duties and responsibilities, because of her complaints about the stress and responsibilities of her job, but Adams argues that she did not ask to be removed from her position as Associate Vice President because of stress and that Sullivan created the new position, which she considered a demotion, to discriminate against her.

After Sullivan submitted Adams's new job description to the Board, Adams sent a memorandum to Dr. Jorndt voicing her displeasure with the position. In the memorandum Adams stated that she was "pleased about getting some relief from the overload" she had been experiencing, but expressed concerns about working in the Marketing department. On June 26 Adams took a leave of absence from Triton for health reasons on the advice of her doctor. (The record does not specify the nature of her health problems.) On July 23 the Board formally offered Adams the new position of Associate Vice President. Adams did not return to work after receiving the offer, and resigned from Triton on September 1, 1998, without ever having filed a response to the Board's offer. Adams testified at her deposition that she felt humiliated by the "demotion" engineered by Sullivan.

2. Moore

Moore commenced his employment at Triton in 1980 as a Computer Operator and was promoted over the years to a Computer Systems Specialist in the Information Systems Department, a Grade 11 position. In the fall of 1998 Triton reorganized its Information Systems Department, leading to what the parties agree was Moore's involuntary transfer from his Computer Systems Specialist position to the position of Audio Visual Equipment Assistant in the Audio Visual Department. The transfer was "involuntary" because it was unacceptable to Moore. The reorganization also led to the involuntary transfer of two other Information Systems employees, neither of whom was African American. Although no other Computer Systems Specialists were transferred, Moore admits that all of the individuals holding this title were considered for the position to which he was transferred. Moore admits that Triton told him he was transferred because it was "in the best interest" of Triton—from all accounts, he was personable with Triton's faculty and had good communication skills. Moore disputes these reasons, asserting that the real reason he was transferred is because he is African American.

Moore's new position was a Grade 6 position, which would have involved a decrease in his compensation. Under union rules, however, Moore maintained his Grade 11 status, and his salary and benefits were not diminished. On September 9, 1998, the day after he learned of the

transfer, Moore took a medical leave of absence from Triton. He did not return to work, and on February 26, 1999, he resigned without ever having responded to Triton regarding their offer of a new position.

### 3. District Court Proceedings

Adams and Moore both filed claims of discrimination with the EEOC in December 1998 claiming that Triton had discriminated against them on the basis of their race with respect to their demotions. Adams also alleged that she had been discriminated against with respect to her salary and conditions of employment (issues not raised on appeal). The EEOC issued right-to-sue letters in March 1999, and Adams and Moore filed a joint suit in the Northern District of Illinois claiming that Triton took adverse employment actions against each of them because of their race. Triton filed a motion for summary judgment which the district court granted in June 2001. In its decision the court found that Adams and Moore each failed to present direct evidence of discrimination and proceeded to analyze their claims under the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court bypassed an analysis of whether Adams and Moore had presented prima facie claims of discrimination and proceeded to the issue of pretext. The court found that Triton had proffered legitimate, non-discriminatory reasons for its actions: it created a new position for Adams because of her complaints about stress, and involuntarily transferred Moore because of the reorganization of the Information Systems Department and because it was in the best interest of the institution. The court also concluded that the evidence presented by Moore and Adams failed to demonstrate that Triton's proffered reasons were mere pretext for discrimination. Adams and Moore appeal.

### DISCUSSION

### 1. Adams's Claims

Initially Adams asserts that the district court erred in granting summary judgment to Triton because she supplied direct evidence that her newly-created position, which she labels a "demotion," was the result of racial bias. Under the direct method of proof, a plaintiff must show "either an acknowledgment of discriminatory intent by the defendant or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir.2001).

■ Adams argues that Sullivan had an improper motive for creating the new position for her because he made racially derogatory statements towards African Americans and thus exhibited a "racially discriminatory attitude." Adams presented evidence that in 1996 Sullivan once referred to Jennifer Lockett, an African–American Triton employee, as a "stupid nigger" when she left his office. Adams also presented evidence that Sullivan told Genevieve Goldthwaite, another Triton employee, that he had joined the NAACP in college "so that no one would ever be able to say he was racist." A decision-maker's use of racially charged language, however, does not alone constitute direct evidence of discrimination. "To rise to the level of direct evidence of discrimination ... isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process." *Markel v. Bd. of Regents of the Univ. of Wis. System*, 276 F.3d 906, 910 (7th Cir.2002) (quoting *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 711 (7th Cir.2000) (alterations in original)). Adams failed to establish how Sullivan's use of racially derogatory comments two years earlier in any way related to his

decision to create a new position for her in 1998. Sullivan's only alleged use of the word "nigger" occurred in 1996 and was not directed towards Adams; she presented no other evidence of instances in which he made racially inflammatory comments. Similarly, Sullivan made his comment about the NAACP in 1996 to Goldthwaite, who was not a decisionmaker. The two-year gap between Sullivan's comments and the allegedly adverse job action taken against Adams is too great to establish a "real link between the bigotry and an adverse employment action," *Gorence*, 242 F.3d at 762, and Adams failed to present direct evidence of discrimination. *See also Markel*, 276 F.3d at 910 (statements made two months before adverse employment action were not contemporaneous to the action and did not present direct evidence of discrimination).

Adams also argues that she proved discrimination under the *McDonnell Douglas* burden-shifting method. Triton disagrees, arguing that Adams failed to set forth a prima facie case of discrimination, and that in any event she failed to show that its proffered reason for creating a new position for her was pretext. While the district court assumed without deciding that Adams had set forth a prima facie case of discrimination, a prima facie case under *McDonnell Douglas* "must be established and not merely incanted." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178 (7th Cir.1997). To make out a prima facie case, Adams needed to show that 1) she is a member of a protected class, 2) she was performing her job to the satisfaction of Triton, 3) she was subjected to an adverse employment action, and 4) similarly situated employees were treated more favorably. *Hoffman–Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 650 (7th Cir.2001).

■ While Adams established the first two prongs of the prima facie case, she failed to prove the remaining elements. First, Adams failed to show that she suffered any adverse employment action. While Triton created a new position for Adams, she failed to demonstrate that the new position would entail a change in her compensation or a "dramatic downward shift in skill level required to perform [her] job responsibilities." *Hoffman–Dombrowski*, 254 F.3d at 651 (quoting *Dahm v. Flynn*, 60 F.3d 253, 257 (7th Cir.1994)). She did not prove that her new job would be anything other than a lateral transfer, without any loss of salary much less benefits, and such a transfer does not constitute an adverse employment action. *See Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 702 (7th Cir.2001); *Gorence*, 242 F.3d at 766 (change in title without loss of pay or benefits does not constitute adverse job action).

Additionally, Adams failed to identify any Triton employee who was similarly situated to her. Employees are similarly situated when there is a "substantial similarity" between their positions, such as a common supervisor and similar standards governing their performance. *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir.2000). The undisputed evidence demonstrates that no employees were similarly situated; Adams did not contest the fact that all employees at the Level A administrator position—the position she held and the relevant comparison group—held separate, distinct positions with "completely different responsibilities." Adams therefore cannot establish that any other Level A administrator held a position substantially similar to her.

■ Even if Adams had set forth a prima facie case of discrimination, she failed to prove that Triton's proffered reason for creating a new position for her—that Adams's job was too stressful—was pretext for discrimination. Because Triton set forth a legitimate, non-discriminatory

reason for creating a new position for Adams, the burden shifted to Adams to show that the reason was false. She could do so by demonstrating that the proffered reason had no basis in fact, did not actually motivate the employment action, or was insufficient to motivate the action. *Velasco v. Illinois Dept. of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir.2001). Adams failed to do so here. The record establishes that Adams suffered stress from her job as Associate Vice President, and Adams presented no evidence other than vague allegations that Sullivan was racist in order to show that her stress was not the real reason for Triton's action. Adams therefore failed to prove that Triton's proffered reason for its action was pretextual.

2. Moore's Claims

■ Moore's arguments mirror those of Adams, and are without merit for substantially the same reasons. Moore failed to provide any direct evidence to show that his involuntary transfer was discriminatory. He relies on the same evidence as Adams (Sullivan's bias against African–Americans), and this evidence does not support his claim. Sullivan's use of the word "nigger," and his claim of joining the NAACP so people would not think he was racist, were not directed at Moore and took place more than two years before Moore's involuntary transfer; Moore therefore failed to demonstrate much less establish a connection between Sullivan's alleged bias and the decision to transfer him to a different department. *Gorence*, 242 F.3d at 762.

■ Moore also failed to establish discrimination under the indirect method. Moore failed to demonstrate that he suffered any adverse employment action because his transfer to the Audio–Visual department did not entail any loss of benefits or salary. *See Stutler*, 263 F.3d at 702; *Gorence*, 242 F.3d at 766. Moreover, he

failed to prove that any similarly-situated employees were treated differently than him. It is undisputed that Triton considered all of the Computer Systems Specialists for an involuntary transfer. Triton chose Moore for the transfer because he had good communication skills and interacted well with Triton's faculty—qualities that the other candidates did not possess. Since the other Computer Systems Specialists did not possess the same qualifications as Moore, they were not similarly situated to him. *See Radue*, 219 F.3d at 618. Moore additionally failed to establish that Triton's reason for transferring him was pretext. Moore presented no evidence, other than the assertions that Sullivan was biased, to demonstrate that Triton's proffered reason for his transfer—his superior communication and inter-personal skills—was not the true reason for its actions. *See Velasco*, 246 F.3d at 1017.

Accordingly, we AFFIRM the judgment of the district court.