James JORDEN, Plaintiff,

v.

WALMART STORES, INC., Defendant.

No. 01–CV–1512.

United States District Court,
C.D. Illinois.

March 29, 2004.

Brian A. Kuehn, Rochford & Assoc, Peoria, IL, for Plaintiff.

William J. Holloway, Hinshaw & Culbertson, Michael T. Roumell, Jason A. Schmidt, Epstein Becker & Green PC, Chicago, IL, for Defendant.

## ORDER

MIHM, District Judge.

This matter is now before the Court on Defendant, Walmart Stores, Inc.'s ("Walmart"), Motion for Summary Judgment. For the reasons set forth below, Walmart's Motion for Summary Judgment [# 24] is GRANTED.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the claim asserted in the Complaint presents a federal question under Title VII, 42 U.S.C. § 2000e, et seq.

## FACTUAL BACKGROUND [1]

■ Plaintiff, James Jorden ("Jorden"), was hired by Walmart as an In-Store Loss Prevention ("LP") Associate at the rate of $7.50 per hour in March 1997. In contrast to Walmart's uniformed security personnel, LP Associates work in plain clothes, and their primary job duties are to detect and apprehend shoplifters. There is no set starting wage for this position; rather, an employee's starting wages are determined on a case-by-case basis, taking into account factors such as the rate of pay requested by the applicant and the applicant's previous LP experience in the retail environment. Periodic pay raises may then be awarded based on performance or other factors. Jorden did not fill out an employment application or submit a resume detailing his past experience at the time he was hired.

After his first 90 days on the job, Jorden received a pay increase from $7.50 per hour to $8.00 per hour. At his first annual performance evaluation in March 1998, Jorden's pay was increased to $8.35 per hour. In October 1998, he received a fifty-cent raise to $8.85 per hour. At his second annual performance evaluation in March 1999, his pay was increased to $9.21 per hour. In May 1999, Jorden received another raise to $9.76 per hour. His pay was increased to $10.53 per hour at his third annual performance evaluation in March 2000, and was increased to $10.95 per hour at his annual evaluation in March 2001. Jorden's hourly wage remained at $10.95 through the time of his termination in April 2002.

Jorden worked at the Walmart store in East Peoria, Illinois. During his employ-

---

1. The Court notes that in response to many of Walmart's allegations of undisputed fact, Jorden responds that he does not have sufficient information to either admit or deny the allegation and provides a non-responsive comment that does not dispute the substance of the alleged fact in any material way. However, as the party opposing summary judgment, it is Jorden's burden to specifically refute any properly supported factual assertions with competent evidence, and the record indicates that the Court granted no less than three extensions of the deadlines in this case (collectively extending the discovery period by more than year) in order to give the parties a full opportunity to conduct discovery. Jorden's response to these facts fails to meet his burden, and as a result, the factual assertions that Jorden purported to "neither admit nor deny" are effectively admitted.

ment, he was supervised by several different individuals who consecutively held the position of District Loss Prevention Supervisor (the "District LP Supervisor") for the Walmart stores in this area. District LP Supervisors hire and set starting wages for new LP Associates and determine merit-based increases for employees under their supervision. In 2001, Anna Bevilacqua became the District LP Supervisor for the Peoria area. She had a different management style than previous supervisors in the Peoria district. Bevilacqua was much more strict than her predecessors and followed Walmart's policies more closely than previous District LP Supervisors.

In early 2001, Leon Mundy ("Mundy") interviewed, hired, and determined the starting wage for Dell Sisco ("Sisco") as an LP Associate for the East Peoria store. Sisco had 3–4 years of specific LP experience in the retail environment. He had recently held a managerial position in the LP department of K–Mart and had won several awards relating to his work in LP. During his interview, Sisco requested that he be paid $12.00 per hour, but ultimately accepted the $11.00 per hour offered by Mundy.

LP Associate Mandi Phillips ("Phillips") learned that Sisco was earning $11.00 per hour and told Jorden. Jorden was upset that Sisco started at $11.00 per hour when he had started at $7.50 per hour in 1997 and was making $10.95 at that time. Jorden and Phillips decided to talk to management about the fact that Sisco received a higher hourly wage.

On April 30, 2001, Jorden and Phillips met with Bevilacqua and Aaron Brauer ("Brauer"), who had filled in as District LP Supervisor for the 2–3 month period before Bevilacqua assumed the position and was in Bevilacqua's office when Jorden and Phillips arrived. During this meeting, Jorden stated that he believed that Sisco made five cents more per hour because Sisco is Caucasian and Jorden is African–American and asked for a raise. Bevilacqua, who was new to the position and was unfamiliar with Jorden, asked him why he thought he deserved a raise. Jorden responded that he had been a loyal employee, shown up when scheduled to work, and had 20 years of prior experience in the security field. Bevilacqua informed Jorden that those facts did not warrant a merit-based increase, which is given to associates who consistently perform above the company's expectations with respect to their job duties, and noted that he had received a forty-two cent pay raise only a few weeks earlier. Phillips, who is Caucasian, also requested a pay increase and was similarly denied.

When Jorden was hired, he was permitted to write "subject to change" on his schedules to accommodate the inconsistent hours that he was required to work at his primary job in the construction business. In contrast to this previous practice, Bevilacqua required everyone to follow their schedules and would not permit Jorden, or anyone else, to continue to write "subject to change" on a schedule. Jorden believed that because he had previously been allowed greater leeway with his schedules, he was entitled to such leeway for as long as he worked at Walmart. In June 2001, he received a verbal warning from Bevilacqua regarding his refusal to follow a set schedule; Phillips and Sisco, who are both Caucasian, also received verbal warnings to this effect.

On May 22, 2001, Jorden filed a charge of discrimination with the EEOC. The charge alleged that he was the victim of racial discrimination because a white male was hired as a LP Associate at a higher rate of pay than he was making at that time.

From May to October 2001, Jorden apprehended a total of nine shoplifters. This

was the lowest six-month total for any LP Associate in Bevilacqua's district during her tenure as District LP Supervisor in the Peoria area. Bevilacqua gave Jorden a formal written warning in October 2001 regarding his low number of apprehensions.

In November 2001, Jorden stopped a shoplifter without complying with all of the requirements set forth in Walmart's procedures for apprehending shoplifters. As a result of this failure, Bevilacqua gave Jorden a final written warning known as a "decision-making day." A decision-making day is when an associate must determine whether they wish to continue their employment with Walmart, and, if so, they must write a written plan of action regarding how the behavioral problem will be corrected. Jorden was informed that the next step of discipline would be termination.

In February 2002, Bevilacqua rated Jorden's performance for the previous year as "below expectations." She asserts that the most critical basis for this lower rating was Jorden's substandard performance in the detection and apprehension of shoplifters. As a result of this evaluation, Jorden did not receive a merit increase in his hourly wage that year.

Subsequent to his 2002 review, Regional LP Director Craig Ledbetter informed Jorden that he had 30 days in which to improve his performance as an LP Associate. During that 30-day period, Jorden made zero apprehensions. District LP Supervisor Jason Bain then terminated Jorden in April 2002.

On December 21, 2001, Jorden filed this suit alleging that he was paid less than a white associate with less experience due to race discrimination in violation of Title VII, 42 U.S.C. § 2000e, et seq; the Complaint does not allege any claim based upon his subsequent termination. Walmart has now moved for summary judgment. The matter is fully briefed, and this Order follows.

## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may meet its burden of showing an absence of disputed material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nevertheless, this Court must "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." *Holland v. Jefferson Nat. Life Ins. Co.,* 883 F.2d 1307, 1312 (7th Cir.1989). Summary judgment will be denied where a reasonable jury could return

a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir.1995).

## DISCUSSION

 Title VII prohibits employers from discriminating "against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1); *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Under Title VII, the plaintiff is required to establish that he has been the victim of intentional discrimination. *Mojica v. Gannett Co., Inc.*, 7 F.3d 552, 561 (7th Cir. 1993). The plaintiff may present direct proof of discrimination, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or may rely on indirect evidence using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden shifting method of proof. Under that approach, the plaintiff bears the burden of presenting evidence sufficient to establish a prima facie case of discrimination. *Cullen v. Indiana University Board of Trustees*, 338 F.3d 693, 704 (7th Cir.2003). If the plaintiff clears this initial hurdle, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer provides such a reason, the burden then shifts back to the plaintiff to produce evidence demonstrating that the employer's stated reason is pretextual. *Id.*

Here, except to make a passing, summary reference to three of the cases cited by Walmart, Jorden makes no citation to the legal framework applicable to addressing his claim and cites none of the numerous cases from the Seventh Circuit addressing disparate treatment on the basis of race. In fact, the entirety of his citation to legal authority consists of six headnote style paragraphs listing the holdings in cases from the Northern District of Illinois, District of Connecticut, Southern District of New York, Ninth Circuit, Western District of North Carolina, and the Tenth Circuit. He makes no attempt to analyze these cases or demonstrate that the facts of these cases are sufficiently analogous to the facts of his case to be persuasive.

 Despite his bald assertion to the contrary, Jorden has not presented any direct evidence of racial discrimination, as he has presented no evidence that proves that he was discriminated against on the basis of race that would not also require substantial inference or presumption in order to be probative. Thus, he must proceed under the *McDonnell Douglas* burden-shifting analysis. However, Jorden makes no attempt to address the essential elements of a prima facie case or the arguments and authority presented by Walmart in its Motion. The argument section of his response consists of twelve conclusory assertions of fact, some of which are unsupported by competent evidence in the record and some of which are contrary to his sworn testimony at his deposition. The majority of these factual assertions appear to focus on an the question of pretext, which the Court does not reach unless and until a plaintiff has established a prima facie case, and are therefore irrelevant to the issue now before the Court. He simply makes no effort to apply law to the facts of record. This kind of perfunctory and undeveloped legal argument is utterly insufficient to survive a motion for summary judgment, and it is well-settled that responses of this type result in the waiver of all arguments. *See, Finance Investment Co. v. Geberit AG*, 165 F.3d 526, 528–29 (7th Cir.1998) (finding a per-

functory and undeveloped argument to be waived); *Volovsek v. Wisconsin Department of Agriculture, Trade and Consumer Protection,* 344 F.3d 680, 689 n. 6 (7th Cir.2003); *Indurante v. Local 705, International Brotherhood of Teamsters,* 160 F.3d 364, 366 (7th Cir.1998); *Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 668 (7th Cir.1998), *cert. den.,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 788 (1999). Accordingly, the Court finds that Jorden has waived all arguments in response to the Motion for Summary Judgment by virtue of his perfunctory and legally undeveloped response, and Walmart is therefore entitled to judgment as a matter of law.

■ Even assuming arguendo that Jorden did not waive all arguments, he must carry the initial burden of establishing a prima facie case of discrimination by showing: 1) he was a member of a protected class; 2) he was performing his job satisfactorily or meeting his employer's legitimate performance expectations; 3) he was subjected to a materially adverse employment action; and 4) others outside of the protected class were treated more favorably. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1032 (7th Cir.1998); *Hoffman–Dombrowski v. Arlington International Racecourse, Inc.,* 254 F.3d 644, 650 (7th Cir. 2001); *Cullen v. Indiana University Board of Trustees,* 338 F.3d 693, 704 (7th Cir.2003). The failure to satisfy any one of these elements is fatal to a plaintiff's claim. While Walmart does not contest Jorden's ability to satisfy the first and third prongs of this analysis, his compliance with the second and fourth criteria is challenged.

■ Jorden must demonstrate that he was meeting Walmart's legitimate expectations. In an attempt to meet this burden, he states:

> Plaintiff received adequate employee evaluations from the time he was hired up to the time preceding the confrontational meeting and the filing of his complaint for racial discrimination with the EEOC; in fact the evaluator provided laudatory comments with each prior evaluation.... [2]

Jorden does not dispute that LP Associates must make apprehensions and perform their other job duties in order to receive merit increases, and there is undisputed evidence in the record that from May 2001 to October 2001, he had the lowest number of apprehensions in the district. There is also evidence indicating that Jorden failed to comply with Bevilacqua's directives and Walmart policy on several occasions, but again, this evidence post-dates April 30, 2001, the date when Bevilacqua denied his request for a raise to eliminate the differential between his rate of pay and Sisco's hourly wage. As the only evidence identified in the record indicating the state of Jorden's performance as of April 30, 2001, consists of performance evaluations that contain both positive and negative comments, the Court cannot find as a matter of law that at the time Bevilacqua denied Jorden's request for pay equal to that received by Sisco, Jorden was not performing in accordance with Walmart's expectations.

■ The remaining prong of the *McDonnell Douglas* test requires Jorden to demonstrate a genuine issue of material fact as to whether similarly situated individuals outside the protected class received

---

**2.** Jorden also states that following the filing of his EEOC complaint, he received less favorable evaluations and was ultimately fired. However, it is important to note that the sole cause of action alleged in Jorden's Complaint is disparate treatment with respect to his pay. He has not pled any claim for retaliation or any claim in connection with his discharge.

more favorable treatment. Specifically, he must at a minimum demonstrate that similarly situated LP Associates who were not African–American received higher starting wages than he did. In an attempt to meet this requirement, Jorden states:

Dell Cisco [sic], a while man with 3.5 years security experience, was paid a starting wage of $11.00 (60% higher than Plaintiff's starting wage) to do exactly the same job as Plaintiff, loss prevention associate, at the East Peoria Wal–Mart Store....There were 8 loss prevention associates working for defendant in the Peoria Region who were paid a higher hourly wage than was paid to Plaintiff James Jorden during the 4 years that he worked for Wal–Mart; ALL EIGHT of the higher paid loss prevention associates are white (Causcasian) [sic].... Those 8 higher paid Caucasian loss prevention associates were all doing exactly the same job being done by Plaintiff .... None of the 8 higher paid Caucasian loss prevention associates had anywhere near the years of prior on-the-job experience as Plaintiff had.

Elsewhere in his response, he identifies these eight individuals as Cisco, Craig Luttrell ("Luttrell"), Clayton Arnold ("Arnold"), Crystal Shipley ("Shipley"), Roland Gandy ("Gandy"), Christie Miller ("Miller"), Shane Rowley ("Rowley"), and Bevilacqua. The sole evidentiary basis for these assertions is Jorden's Affidavit, which contains no information suggesting how he purportedly knew this information. Nor does the Affidavit contain any support for the assertion that none of these LP Associates had "anywhere near the years of prior on-the-job experience as Plaintiff had." It is well established that a plaintiff cannot defeat summary judgment through bald, conclusory allegations that are nothing more than "[s]elfserving assertions without factual support in the record." *Weeks v. Samsung Heavy Industries Co., Ltd.,* 126 F.3d 926, 934 (7th Cir.1997),

*quoting Jones v. Merchants National Bank and Trust Co.,* 42 F.3d 1054, 1058 (7th Cir.1994).

■ Other than stating that these individuals held the same position of LP Associate, Jorden makes no attempt to demonstrate that any of them were actually similarly situated. Similarly situated employees are employees who are "directly comparable to him in all material respects." *Grayson v. O'Neill,* 308 F.3d 808, 819 (7th Cir.2002), *citing Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). A plaintiff must show "a 'substantial similarity' between their positions, such as a common supervisor and similar standards governing their performance." *Adams v. Triton College,* 35 Fed. Appx. 256, 2002 WL 850391, at *260 (7th Cir. April 29, 2002), *citing Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–18 (7th Cir.2000).

■ The Court must consider all relevant factors given the particular circumstances at issue. *Grayson,* 308 F.3d at 819, *citing Radue,* 219 F.3d at 617. This normally entails a showing that the employees dealt with the same supervisor, as well. *Id.* at 618. Under the facts of this case, the Court finds factors such as the length of employment with the employer/timing of hiring decision, starting salary, experience, education, qualifications relevant to the position at issue, performance, the salary made at the individual's previous position, and the identity of the hiring decision-maker to be relevant.

With the exception of Sisco, Jorden makes no attempt to indicate, much less compare, the length of employment, starting salary, education, experience, performance, or the salary made at a previous position of any of the purportedly comparable individuals, and the record is simply devoid of evidence establishing that these employees were hired by Kevin Grissell,

the manager who hired Jorden in 1997, or Bevilacqua, the supervisor who denied him the requested raise. Based on the record before the Court, it is entirely possible that these employees were hired at the same rate as Jorden but had been LP Associates long enough to have earned more merit raises than he had, that they had some experience/education that could reasonably justify starting them out at a higher rate of pay than the $7.50 that Jorden initially received, or that the alleged disparity was the result of decisions by different supervisors exercising their discretion. Thus, Jorden has not demonstrated, and no reasonable jury could find, that Luttrell, Arnold, Shipley, Gandy, Miller, Rowley, or Bevilacqua were similarly situated for purposes of satisfying the fourth prong of the *McDonnell Douglas* inquiry.

With respect to Sisco, Jorden asserts that Sisco had only 3.5 years of experience doing LP work for K–Mart before coming to Walmart. However, he does not offer any information pertaining to Sisco's education or experience obtained somewhere other than K–Mart or acknowledge that Sisco had been making $13.00 per hour at his previous job, which would reasonably have played some role in the determination of his starting rate of pay at Walmart. Nor does he provide any evidence indicating that the starting wage range that was being used in 2001 was necessarily the same as it had been four years earlier when he was hired or that starting wages had not fluctuated upward with inflation.

It is also undisputed that different decision-makers were involved. Sisco was hired and assigned a starting wage by Mundy, while Jorden had been hired and assigned a starting wage by Grissell. There is no evidence indicating that Grissell started other employees who were not African–American at a higher rate than Jorden, that Bevilacqua played any role in Sisco's hiring or the determination of his hourly wage, or that Bevilacqua gave raises to other LP Associates that were not African–American. In fact, the record indicates that Bevilacqua also denied a raise to Phillips, a Caucasian who requested a raise at the same time and for substantially the same reasons as Jorden. This alone "probably precludes a showing of similarity because when 'different decision-makers are involved, two decisions are rarely similarly situated in all relevant respects.'" *Id.* at 618.

> Different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a prima facie case of discrimination for the simple reason that different supervisors may exercise their discretion differently. These distinctions sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination.

*Id.* Accordingly, Jorden has also failed to present sufficient evidence from which a reasonable jury could infer that Sisco was similarly situated.

This Court does not sit as a "super-personnel department" to evaluate the wisdom or correctness of an employer's employment decisions. *Grayson*, 308 F.3d at 820. Walmart's knowledge of Jorden's purported experience in loss prevention at the time he was hired and his hourly wage was determined is not supported in the record. To the contrary, it would appear that Walmart had very little information at that time, as Jorden has testified that he did not even complete an application for employment or submit a resume until at least a year after he was hired. Jorden has also conceded that he made $8.00 per hour at his other security job at that time. Thus, it is difficult to see why Jorden

should automatically have received a higher hourly wage when he was hired in 1997.

It is also worth noting that Walmart has introduced uncontroverted evidence indicating that out of the 25 LP Associates employed in the Peoria area in 1999, 18 of them received a lower hourly wage than Jorden and 17 of those employees were Caucasian. Similarly, in 2000, there were 26 LP Associates in the Peoria area, 21 of whom were Caucasian and consistently received a lower hourly wage than Jorden. In 2001, Walmart employed 19 people as LP Associates in the Peoria area; 12 of these employees consistently received a lower hourly wage than Jorden and all of the 12 were Caucasian. While this is not conclusive evidence of non-discrimination based on a lack of information concerning the same factors discussed above to determine similarly situated employees, it does promote the reasonable inference that factors other than race were at work here.

Jorden devotes a substantial part of the brief argument section of his response to the assertion that Brauer was a racist and had made derogatory statements to him. However, this is really inapposite, as Jorden has conceded that Brauer did not make the decision to hire him or determine what his starting wage would be, that he received regular merit raises during the brief time that Brauer was filling in as District LP Supervisor, and that it was Bevilacqua that made the decision to deny Jorden the requested raise. There is also no evidence indicating that Brauer influenced Bevilacqua's decision to deny Jorden's requested raise. As Jorden failed to meet his burden of demonstrating that any similarly situated employees outside of his protected class were treated differently, he has necessarily failed to present a prima facie case of racial discrimination under Title VII. Walmart would therefore be entitled to summary judgment on this basis, as well.

## CONCLUSION

For the foregoing reasons, Walmart Stores, Inc's Motion for Summary Judgment [# 24] is GRANTED. This matter is now TERMINATED, and all existing deadlines are VACATED.