# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3043

DEBORAH CULLEN,

*Plaintiff-Appellant,*

v.

INDIANA UNIVERSITY BOARD
OF TRUSTEES,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 00 C 1107—**Richard L. Young**, *Judge.*

———————

ARGUED APRIL 10, 2003—DECIDED JULY 29, 2003

———————

Before BAUER, RIPPLE and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On July 6, 2000, Deborah Cullen, Ed.D., filed a complaint against the Indiana University Board of Trustees (the "University"), alleging violations of the Equal Pay Act and of Title VII, based on sex discrimination and retaliation. The University filed a motion for summary judgment, which the district court granted on July 2, 2002. Dr. Cullen filed this appeal on July 29, 2002. She appeals all of the district court's determinations except for its grant of summary judgment in favor of the University on the retaliation claim. For the reasons set forth in the

following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Deborah Cullen began her employment at Indiana University's Indianapolis campus in May 1990. She was appointed Director of the Respiratory Therapy Program, with the rank of associate professor. She also was credited with three years toward tenure. Her salary was $45,000. Dr. Cullen's male predecessor had been paid $36,742. The Respiratory Therapy Program operates as a department of the School of Allied Health Sciences ("SOAHS"), which has eighteen programs, including Physical Therapy.

Dr. Cullen holds a Bachelor of Science degree in Respiratory Therapy, a Master of Arts in Education and a Doctor of Education degree. She had fifteen years' teaching experience prior to arriving at the University, including serving as Director of Grossmont College's two-year Respiratory Therapy Program from 1984-1990. In 1994, Dr. Cullen was granted tenure at Indiana University; she was promoted to full professor in April 1995. Dr. Cullen has chaired numerous committees, authored articles and secured grants for the Respiratory Therapy Program, including $150,000 of annual funding from Clarian Health Providers. In 1997, acting SOAHS Dean Mark Sothmann increased her salary from approximately $58,000 to $62,000, so that she would be paid more than a male associate professor whom she supervised. From 1991 through 1998, Dr. Cullen's annual salary increases averaged 4.37%; the average of SOAHS faculty increases was 3.25% per year.

In July 1998, Sandy Quillen, Ph.D. was hired by Dean Sothmann as Program Director for Physical Therapy and as a tenured associate professor at a salary of $90,000. His predecessor, a woman, had been paid $85,696. Dr. Quillen holds five degrees: a Bachelor of Science degree in Health and Physical Education, a Bachelor of Science degree in Physical Therapy, a Master of Education in Developmental and Adaptative Physical Education, a Master of Public Affairs in Health Services Management, and a Ph.D. in Sports Medicine. Before he was hired by the University, Dr. Quillen was Chair of the Department of Physical Therapy at the College of Mount St. Joseph in Cincinnati, Ohio. In that post, he was paid a comparable salary in the "high 80's." R.68, Ex.2 at 125-26.

At the time of Dr. Quillen's hiring, Dean Sothmann conducted a national search, but received few applications for the Physical Therapy Program Director position. The Physical Therapy Program was on probationary accreditation status and in danger of losing its accreditation. This situation presented a major problem for the University because students must graduate from an accredited program in order to be permitted to sit for the physical therapy licensing exam. Upon assuming his responsibilities, therefore, Dr. Quillen was required to extricate the program from probation and to create a graduate program in order to maintain accreditation. Dr. Quillen has launched successfully a graduate program, which now offers the only doctoral program in the SOAHS.

The Physical Therapy Program accounts for a significant amount of tuition in the SOAHS; for example, in 1998-99, it generated 29.3% of the SOAHS' tuition revenue. In fact, the SOAHS could not survive without a financially viable Physical Therapy Program. In 1998-99, Physical Therapy generated $567,771 to Respiratory Therapy's $87,517. Phys-

ical Therapy also has twice as many students and faculty as Respiratory Therapy (e.g., in 1999, 116 students as opposed to 57 students and 6 faculty as opposed to 3 faculty). Between 1995 and 2000, Physical Therapy awarded two and a half times as many bachelor's degrees as Respiratory Therapy.

During 1998-99, Dr. Cullen was paid $63,240; Dr. Quillen was paid $90,000. In 1999-00, the comparison was $67,114 to $93,150; in 2000-01, $68,121 to $94,547; and in 2001-02, $70,505 to $97,856. This disparity is in accord with the average differential between directors in these positions at other Midwestern schools. That disparity was $18,000 in 1999, more than $20,000 in 2000, and approximately $30,000 in 2001. Both Dr. Cullen and Dr. Quillen are compensated within the range of salaries paid for their respective disciplines.

In the early 1990s, a University professor of economics, Paul Carlin, conducted a pay equity study. The study found a statistically significant gap between the salaries of male and female faculty members, and Carlin could not rule out discrimination as a cause. In 1997-98, Patrick Rooney, Special Assistant to the Chancellor, and Paul Carlin conducted a second study, which was controlled for a number of factors. The results found a "statistically-significant" gap between the salaries of male and female faculty members. R.71, Ex.D at 25. Dr. Cullen was identified as an "outlier," which the study defined as more than one standard deviation below her predicted salary for 1996-97. Her predicted salary was $71,313.60. One standard deviation below this figure is $61,774.29. Dr. Cullen actually earned $58,128. Paul Carlin testified that he could not rule out gender discrimination as the cause of Dr. Cullen's lower salary. It is notable that approximately 60% of the outliers identified by the study were male.

The University submits that, although the study is a helpful tool, it fails to account accurately for the market at the time of hire and for an individual's productivity. The study was not designed to ascertain the appropriate salaries of professors, but was to be used as a first step in the compensation analysis. It contemplated that committees in each department would undertake a further assessment that took into account individual factors. The University also notes that, for purposes of academic research, a figure of less than two standard deviations is not considered statistically significant; however, it identified individuals of greater than one standard deviation as outliers in order to ensure a thorough analysis. Dr. Cullen's salary fell between one and two standard deviations.

The SOAHS ad hoc review committee "strongly recommend[ed]" that Dr. Cullen's pay be increased to rectify salary inequity, but concluded that her history of small incremental salary increases was not significantly less than the averages for SOAHS and Respiratory Therapy faculty. R.71, Ex.11. Dean Sothmann informed Dr. Cullen that he would recommend a raise to her "predicted salary of $64,901." R.71, Ex.10. This "predicted salary" is one standard deviation below the mean figure. Dean Sothmann also informed the Chancellor's office that Dr. Cullen's salary ought to be adjusted to the predicted level. Dr. Cullen's salary was then adjusted from $63,240 to $64,901.

**B. District Court Proceedings**

Before the district court, Dr. Cullen alleged that the University discriminated against her in violation of the Equal Pay Act and on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964. Dr. Cullen claimed that the University employed a similarly situated male, Dr.

Quillen, to perform the same job as her own and paid him a higher salary. Moreover, she argued that the University's actions constituted indirect evidence of an intent to pay her less than male employees because of her gender. The University moved for summary judgment on both claims. The district court granted summary judgment for the University on the Equal Pay Act claim because it determined that Dr. Cullen failed to establish a prima facie case. *See* R.86 at 20. The court concluded that Dr. Quillen had "substantially more additional responsibilities than Dr. Cullen which justifi[ed] his higher salary." *Id.*

Alternatively, the court concluded that, assuming a prima facie case, Dr. Cullen's evidence did not present a material dispute to contradict the University's affirmative defense that the pay differential was based on factors other than sex. *See id.* at 23. The court noted the significance of disparate educational backgrounds and job responsibilities as reasons for its conclusion that the University had carried its burden of persuasion on the affirmative defense. *See id.* at 21-22. The court also concluded that the University's Pay Equity Study was not prima facie evidence of wage-based discrimination because it was not designed to prove or calculate discrimination alone but to identify cases that merited further inquiry. *See id.* at 22-23.

With respect to the Title VII claim, the court concluded that Dr. Cullen failed to establish a prima facie case because she did not identify an adverse employment action (her salary was increased) or present evidence of a similarly situated male that was treated more favorably. *See id.* at 24-25. The court also found it significant that there was no evidence of intent to discriminate. *See id.* at 25.

## II

## DISCUSSION

### A. Equal Pay Act

Dr. Cullen submits that the district court erred in granting summary judgment in favor of the University on her Equal Pay Act ("EPA") claim; we review a district court's grant of summary judgment de novo. *See Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002).

#### 1. Prima Facie Case

To establish a prima facie case of wage discrimination under the EPA, Dr. Cullen must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681, 685 (7th Cir. 1998). In determining whether two jobs are equal, the crucial inquiry is "whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." *Fallon v. Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989) (citations and quotation marks omitted). Once the plaintiff establishes a common core, the court must ask whether any additional tasks make the jobs "substantially different." *Id.* (citation and quotation marks omitted). Significantly, the EPA does not require proof of discriminatory intent. *See Stopka*, 141 F.3d at 685.

It is undisputed that in this case the first element is established. In 1998-99, Dr. Cullen was paid $63,240 and Dr. Quillen, a male, was paid $90,000. *See* R.71, Ex.27. The disparity continued through the 2001-02 academic year when Dr. Cullen earned $70,505 and Dr. Quillen earned

$97,856. *See* R.71, Ex.43. Nevertheless, Dr. Cullen must establish that the jobs were equal. Although the "common core" of the positions held by Dr. Cullen and Dr. Quillen suggests equality, Dr. Quillen's job entailed significant additional responsibilities, making it substantially different. The EPA specifies three separate elements that are to be considered in comparing job duties: skill, effort and responsibility. *See* 29 U.S.C. § 206(d)(1). Each of these elements must be met individually to establish a prima facie case. *See* 29 C.F.R. § 1620.14.[1] Moreover, the jobs must be performed under similar working conditions. *See* 29 U.S.C. § 206(d)(1)*; Stopka*, 141 F.3d at 685.

First, we consider whether the positions required the same level of skill. "Skill includes consideration of such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a). Although Dr. Cullen and Dr. Quillen have different educational credentials, the comparison at this juncture is between positions, not individuals. *See id.* ("Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill."); 4 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 20.15[B], at 20-123-24 (2003) (noting that the issue is comparison of jobs, individual qualifications are irrelevant at this point in the analysis).[2] Although different educational levels required by

---

[1] The regulations are cast in very general terms in order to ensure general applicability throughout the economy. Consequently, in their application, a single factual consideration is often relevant to more than one of the criteria established by the regulations.

[2] The actual differences between educational pedigree are relevant in the affirmative defense of proving a pay differential based

(continued...)

different positions can be significant, there is no suggestion that Physical Therapy Program Directors are required to hold more degrees than Respiratory Therapy Program Directors. However, the positions did require different levels of ability, for the Physical Therapy Program Director was required to create a new graduate program, which the Respiratory Therapy Program Director position did not require. *See Horner v. Mary Inst.*, 613 F.2d 706, 714 (8th Cir. 1980) (finding different skill requirements between positions of elementary school teachers when one teacher was required to develop and implement a physical education curriculum and the other was to teach courses selected by someone else). Accordingly, the positions do not require equal levels of skill.

The second inquiry is whether the two positions require equal amounts of effort. Dr. Quillen was appointed when the Physical Therapy Program was on probation, and he was given the task of saving the program and creating a graduate course of study. *See* R.68, Ex.2 at 124-26. Dr. Cullen nevertheless submits that, although Physical Therapy has a strong tuition base, she had to exert more effort to secure outside funding to supplement her department's resources, an effort, she claims, that Dr. Quillen does not match. *See* R.71, Ex.B at 49-53; R.71, Ex.42 at 8. Although this consideration may decrease somewhat the significance in the disparity between the effort required by the two positions, we think the district court correctly concluded that the effort required to create Master's and Doctoral courses of study in a program on probation to be greater than that required to secure grants for the Respiratory

---

[2] (...continued)
on "any factor other than sex." *See Covington v. Southern Illinois Univ.*, 816 F.2d 317, 323 n.9 (7th Cir. 1987).

Therapy Department. *See* R.75, Ex.24 at ¶¶ 12-13 (stating that Physical Therapy requires a graduate program to maintain accreditation, and failure to do so would preclude graduates from sitting for the licensure exam); R.68, Ex.2 at 124-26 & 137; R.68, Ex.20 at ¶ 12 (indicating that SOAHS would not be able to operate without a viable Physical Therapy Program); 29 C.F.R. § 1620.16(a) ("Job factors which cause mental fatigue and stress . . . are to be considered in determining the effort required by the job."). The jobs do not require equal effort; Dr. Cullen cannot establish her prima facie case of equal positions.

Third, we must determine whether the two positions impose the same level of responsibility. The Respiratory Therapy Program at the University required Dr. Quillen to create and launch a graduate program. Dr. Cullen is not responsible for such a program. *See* R.68, Ex.2 at 124-26. Dr. Cullen argues that the creation of the graduate program was not an additional duty, for she was also required to meet accreditation requirements. However, this argument places too much emphasis on the job description or title of "establishing program accreditation," *see* R.71, Ex.B at 45, instead of considering "the duties actually performed by each employee." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994).

Dr. Quillen supervises more students and faculty members. As of September 1999, Dr. Quillen was responsible for 116 students to Dr. Cullen's 57, and Dr. Quillen supervised six faculty members and two secretaries to Dr. Cullen's three faculty members and one secretary. *See* R.71, Ex.25 at 5. Dr. Cullen contends that the record contains no evidence that Dr. Quillen exercises any supervision over students or that the additional faculty members create a greater bur-den in terms of responsibility. Supervisory responsibilities "must be real, significant, regular, and recurring." Mack A.

Player, *Employment Discrimination Law* § 4.11(b)(3), at 147-48 (1988). Nevertheless, it is reasonable to conclude that Dr. Quillen's management of a department twice the size of Dr. Cullen's is indicative of greater responsibility. *See Howard v. Lear Corp. Eeds & Interiors*, 234 F.3d 1002, 1005 (7th Cir. 2000) ("The additional skill, effort, and headache involved in managing three to six times the number of workers in a more complex employment environment rendered the [] positions . . . substantially different . . . ."); *Orahood v. Board of Tr. of Univ. of Arkansas*, 645 F.2d 651, 655 (8th Cir. 1981) (affirming a finding of unequal positions because male employee supervised a much larger department with more employees).

The most significant factor in this responsibility comparison is the differential in tuition revenue generated by each program. Each school at the University must operate with budgets based on the tuition resources generated within the school. *See* R.75, Ex.27 at 31 & 56. Significantly, Physical Therapy generates nearly 30% of SOAHS' tuition revenue, and the school would not be able to operate without a viable Physical Therapy Program. *See* R.68, Ex.2 at 137; R.68, Ex.20 at ¶ 12. In 1998-99, the Physical Therapy Program produced more than six times the tuition generated by Respiratory Therapy. *See* R.71, Ex.25 at 5. In *Stanley v. University of Southern California*, 13 F.3d 1313 (9th Cir. 1994), the Ninth Circuit concluded that the additional pressure to win placed on the USC men's basketball coach created a different job under the EPA because the men's program generated ninety times more revenue than the women's program. *See id.* at 1322-23. The court found that "the relative amount of revenue generated should be considered in determining whether responsibilities and working conditions are substantially equal." *Id.* In this case, the SOAHS' dependence upon the revenue generated by the

Physical Therapy Program creates additional pressure and responsibility on the Director of the Physical Therapy Program, Dr. Quillen. Consequently, the positions do not have equal levels of responsibility; therefore, Dr. Cullen cannot establish a prima facie case.[3]

## 2. Pay Equity Study

Dr. Cullen contends that the district court erred by failing to consider the Pay Equity Study as evidence to prove her prima facie case under the EPA. She argues that, because she has identified a specific male comparator, Dr. Quillen, this court should adopt the Second Circuit's rationale in *Lavin-McEleney v. Marist College*, 239 F.3d 476, 481 (2d Cir. 2001), and permit her to rely on statistical evidence to support her prima facie case. In *Lavin-McEleney*, the Second

---

[3] The district court did not reach the issue of similar working conditions, but the University contends that Dr. Cullen cannot meet this requirement because Dr. Quillen was hired to extricate the Physical Therapy Program from probation, which is a dissimilar working condition. In *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), the Supreme Court concluded that "working conditions" refers to physical surroundings and hazards encountered on the job. *See id.* at 202; 29 C.F.R. § 1620.18 ("The term 'similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.' 'Surroundings' measure the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity and their frequency. 'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause."). In this case, the parties have introduced no evidence that Dr. Cullen and Dr. Quillen are exposed to different physical surroundings or hazards in performing their duties, therefore they cannot be said to work under dissimilar conditions.

Circuit held that "statistical evidence of a gender-based salary disparity among comparable professors properly contributed to plaintiff's case in conjunction with her identification of a specific male comparator."[4] *Id.* The court specifically declined to decide whether statistical evidence alone would be sufficient to establish a prima facie case under the Equal Pay Act. *See id.* at 482. As we have discussed above, in Dr. Cullen's case, Dr. Quillen is not a comparable male. Therefore, if she is to prevail, she must rely on statistics alone to support her prima facie case. We have noted that, in the Title VII context, statistical evidence

---

[4] The University contends that, even if the court should consider statistics alone, the Pay Equity Study is not admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in part, because certain critical factors such as productivity are difficult to quantify. However, this argument is not in accord with the Supreme Court's discussion of regression analyses in *Bazemore v. Friday*, 478 U.S. 385 (1986). In Justice Brennan's concurring opinion in *Bazemore*, which was joined by all other members of the Court, he stated:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for major factors "must be considered unacceptable as evidence of discrimination." Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.

*Id.* at 400 (Brennan, J., concurring) (citation omitted). *See Rudebusch v. Hughes*, 313 F.3d 506, 516 (9th Cir. 2002) (citing *Bazemore* for the proposition that the "propriety of controlling for particular variables in a regression analysis goes to weight rather than admissibility"); *Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 676-77 (4th Cir. 1996) (finding that disputes over excluded variables in multiple regression analysis are questions of material fact precluding summary judgment).

of discrimination may be very useful, but "it will likely not be sufficient in itself." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 423 (7th Cir. 2000).[5] We need not decide today whether Dr. Cullen could base her prima facie EPA case solely on statistical evidence because the Pay Equity Study could not establish discrimination alone on these facts.

The study was designed as the initial step in a two-part process of evaluating faculty for raises, not as a single quantitative measure of appropriate salaries. In fact, in order to ensure thoroughness, the University characterized Dr. Cullen as an "outlier" even though generally accepted principles of statistical modeling suggest that a figure less than two standard deviations is considered an acceptable deviation. *See* R.71, Ex.D at 28-29.[6] Although the study

---

[5] *See also Rudebusch*, 313 F.3d at 515-17 (concluding that a pay equity study finding 2.0 standard deviation among salaries was insufficient to establish discrimination in violation of Title VII in light of evidence that salaries fell below predicted levels across ethnic and gender lines); *cf. Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1135-36 (5th Cir. 1983) (stating "[i]t may well be question-able whether in an action grounded on a classic unequal pay for equal work claim, such statistics could ever suffice to make a *prima facie* case, if the proofs were otherwise insufficient for pur-poses of an individual Equal Pay Act or Title VII disparate treatment suit").

[6] *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) (commenting that "[t]wo standard deviations is normally enough to show that it is extremely unlikely . . . that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away, the less likely the factor in question played no role in the decisionmaking process"). *But see Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362 (7th Cir. 2001) (rejecting bright-line rule that

(continued...)

sought to account for market forces by considering average national salaries for a given position, *see* R.71, Ex.D at 26-28, the study could not consider the significance of detailed individual facts such as those surrounding the University's need to pay a premium to attract Dr. Quillen to accept a position as the director of a distressed program. Because of such particularized factors, the University determined that the Pay Equity Study would serve as a rough starting point to be followed by committee review. The Pay Equity Study was instructive in identifying faculty members deserving further review, but it cannot support a prima facie case of discrimination under the EPA.

As a second step in the reevaluation of faculty pay, the University directed each school to establish a review panel to consider the individual characteristics of all outliers. In the SOAHS, the ad hoc review panel consisted of four women and one man, and it "strongly recommend[ed] that an adjustment to [Dr. Cullen's] base salary be made to rectify the salary inequity." R.71, Ex.11. The committee also found that Dr. Cullen's salary increments were not significantly less than the averages for the SOAHS or Respiratory Therapy Program faculty and concluded that her salary increments reflected the school's history of small salary increases. *See id.*

### 3. Affirmative Defense

Assuming that Dr. Cullen had established a prima facie case, which she did not, the burden of persuasion shifts to the University to prove one of four statutory affirmative defenses. *See* 29 U.S.C. § 206(d)(1); *Dey*, 28 F.3d at 1462

---

[6]  (...continued)
would find statistical evidence of less than two standard deviations inadmissible).

(noting defendant bears burden of proof on affirmative defense). The University relies on the defense that there exists "a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv).

Education is a relevant consideration in determining whether disparate salaries exist for reasons other than sex. *See Covington v. Southern Illinois Univ.*, 816 F.2d 317, 323 n.9 (7th Cir. 1987). Dr. Cullen holds three degrees, and neither of her graduate degrees are in the field of Respiratory Therapy. *See* R.71, Ex.A at 13-20. Dr. Quillen holds five degrees, including a Ph.D. in Sports Medicine. *See* R.75, Ex.D. It is possible for an individual to earn a Ph.D. in Respiratory Therapy, but Dr. Cullen does not have such a degree. *See* R.71, Ex.A at 20. Dr. Quillen clearly holds more degrees with a focus in his respective discipline. This consideration supports the University's position that this was a valid reason other than sex to pay Dr. Quillen more than Dr. Cullen.

The University also focuses on market forces at the time of Dr. Quillen's hiring. *See Stanley*, 13 F.3d at 1322 ("An employer may consider the marketplace value of the skills of a particular individual when determining his or her salary."); *Ross v. University of Texas at San Antonio*, 139 F.3d 521, 526 (5th Cir. 1998) (commenting that disparities were accounted for by market factors). At the time Dr. Quillen was hired, the Physical Therapy Program was on probation and any potential applicant for the position would be required to take over a foundering department, extricate it from probation by the accrediting body, and create a graduate program. *See* R.68, Ex.2 at 124-26. Faced with these responsibilities, the national applicant pool was small, and the University found it necessary to offer Dr. Quillen a significant salary to attract him to take the position.

It is also notable that in 1999 Physical Therapy directors were paid $18,000 more than their peers in Respiratory Therapy, a disparity that increased to approximately $30,000 in 2001. *See* R.75, Ex.I. Additionally, in establishing a starting salary it is also appropriate to consider the salary a newly hired employee was receiving elsewhere. *See Dey*, 28 F.3d at 1462. Dr. Quillen was compensated in the "high 80's" in his previous position. R.68, Ex.2 at 125-26.

Moreover, as we have noted earlier, it is significant that Dr. Quillen is responsible for a department that generates six times as much revenue as Dr. Cullen's and that is vital to the operation of SOAHS. *See* R.68, Ex.2 at 137; R.68, Ex.20 at ¶ 12; R.71, Ex.25 at 5. *See also* Player, *Employment Discrimination Law* § 4.14(e)(2)(h), at 173-74 ("An employer may provide different wage rates for the sale or production of products based upon the relative economic benefit or profitability of the product."). The University's decision to compensate Dr. Quillen for the pressure imposed by this added responsibility constitutes another reason other than sex that explains his salary. Dr. Cullen has not provided sufficient evidence to place a material fact in dispute regarding the University's affirmative defense that Dr. Cullen and Dr. Quillen were paid different salaries "based on any other factor other than sex."[7] 29 U.S.C. § 206(d)(l)(iv).

---

[7] Because Dr. Cullen cannot establish a prima facie case and because the University can establish an affirmative defense, we need not address Dr. Cullen's contention that the University's alleged violation of the EPA was willful.

**B. Title VII**

Having addressed Dr. Cullen's arguments concerning the Equal Pay Act, we turn to her Title VII claim, for "even if the plaintiff's Equal Pay Act and Title VII claims [are] identical, Title VII is an independent remedy, in that it may be pursued in conjunction with other remedies." *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 130 (7th Cir. 1989) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48-49 (1974)); *see County of Washington v. Gunther*, 452 U.S. 161, 178-80 (1981) (commenting that Title VII's coverage of equal pay claims is broader than that of the EPA); *Fallon v. Illinois*, 882 F.2d 1206, 1218 (7th Cir. 1989) (holding that the EPA and Title VII are distinct remedies). Dr. Cullen seeks to establish her Title VII claim by relying on indirect evidence of discrimination.[8] Therefore, the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), governs our analysis. *See Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). In this context, to establish a prima facie case of sex discrimination under Title VII, Dr. Cullen must show that 1) she was a member of a protected class, 2) she was meeting her employer's legitimate expectations, 3) she suffered an adverse employment action, and 4) the employer treated a similarly situated man more favorably. *See Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742-43 (7th Cir. 1999); *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 561 (7th Cir. 1998). If Dr. Cullen establishes a prima facie case, the burden shifts to the University to provide legitimate reasons for the dispar-

---

[8] Moreover, a Title VII plaintiff must prove the intent to discriminate, specifically the "actual desire to *pay* women less than men because they are women." *Lloyd v. Phillips Bros., Inc.*, 25 F.3d 518, 525 (7th Cir. 1994) (emphasis in original).

ity. *See Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 478 (7th Cir. 1995). If the University provides legitimate reasons, then Dr. Cullen must establish that the proffered reasons are pretextual. *See id.*

Dr. Cullen cannot establish a prima facie case because she has not presented evidence of a similarly situated male that the University treated more favorably. Dr. Quillen is not a similarly situated male and, as discussed above, the Pay Equity Study is not sufficient to establish gender discrimination. Nevertheless, even if we assume that Dr. Cullen can establish her prima facie case, Dr. Cullen has failed to introduce sufficient evidence to create a material dispute regarding pretext. The University has provided unrebutted, nondiscriminatory reasons for the pay disparity, including market forces at the time of Dr. Quillen's hiring, different educational credentials, and differences in responsibility due to the larger amount of revenue generated by the Physical Therapy Department. Consequently, Dr. Cullen cannot prevail on her Title VII claim.

## Conclusion

The judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*