In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-4053

JANET M. MERILLAT,

*Plaintiff-Appellant*,

*v.*

METAL SPINNERS, INCORPORATED,

*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 04 C 193—**William C. Lee**, *Judge.*

_____

ARGUED MAY 8, 2006—DECIDED DECEMBER 6, 2006

_____

Before BAUER, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.*    Janet M. Merillat brought this
action against her former employer, Metal Spinners, Inc.,
("Metal Spinners"). She alleged age discrimination in
violation of the Age Discrimination in Employment Act
("ADEA"), 29 U.S.C. § 621 et seq.; sex discrimination in
violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e et seq.; and a violation of the Equal Pay Act
("EPA"), 29 U.S.C. § 206(d). Metal Spinners filed a mo-
tion for summary judgment; the district court granted
that motion. For the reasons set forth in the following
opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

**A. Facts**

Metal Spinners provides a variety of metal-forming services, including metal spinning. Olin Wiland has been its chief executive officer since 1997.

Ms. Merillat began her employment with Metal Spinners in September 1983. At all times relevant to this litigation, she worked in the materials department, which consisted of Ms. Merillat and Amy Stevenson, who initially was supervised by Ms. Merillat. Until December of 2002, Ms. Merillat's title was Purchase Manager; she then became the Senior Buyer. As the Senior Buyer, her duties included creating various reports, purchasing, entering orders, shipping, meeting with management, scheduling trucks, supervising department employees, negotiating with suppliers, evaluating suppliers and creating a plan for reducing the costs of tools. Ms. Merillat tracked suppliers, shipments and inventory by using three different computer programs: Vantage, Al-Net and Excel. Consequently, Ms. Merillat sometimes had to enter the same data into more than one computer program. Ms. Merillat admitted that some of her computer tasks were redundant, but maintains that Metal Spinners failed to give her the computer upgrades and training that would have enabled her to create all necessary reports on only one program.

In August of 2002, Metal Spinners created a new position, "Vice President of Procurement and Materials Management," and Wiland began a search for an individual to fill this position. The duties of this position included managing the materials department employees (Ms. Merillat and Stevenson), as well as establishing

strategies to reduce inventory costs and increase profitability. The successful candidate would be expected to implement a new computer system. In November, Wiland offered the position to Craig Wehr. Wehr was 38 years old when he was hired; his starting salary was $62,500. At that time, Ms. Merillat earned $49,800. Ms. Merillat helped to train Wehr after he was hired.

Ms. Merillat had kept a cartoon posted on her bulletin board that lampooned the difference between salaries for men and women. The cartoon, which reasonably could be described as somewhat crude, had been displayed on her board for over fifteen years. On the day that Wiland told Ms. Merillat that Wehr had been hired, he asked her to take the cartoon down.

In late 2002 and the first half of 2003, Metal Spinners experienced significant financial difficulties and decided to eliminate some positions to decrease costs—a reduction in force ("RIF"). Ms. Merillat and another individual, Patrick O'Beirne, were terminated on June 3, 2003. Two other individuals were terminated on June 4, 2003. One of those individuals, John Johnson, retired. The other, Jim Cranfull, had his position eliminated, but he was allowed to return to a former position on the production floor.

On the date of her termination, Ms. Merillat was 49 years old; Wehr was 38 years old. Some of Ms. Merillat's former duties, such as creating various reports, are now performed by the Vantage computer system, following a technical upgrade by Metal Spinners; other of Ms. Merillat's tasks have been absorbed into the positions occupied by Wehr and Stevenson.

**B. District Court Proceedings**

In addressing the merits of Metal Spinners' summary judgment motion, the district court first observed that Ms. Merillat had offered no direct evidence of either sex or age discrimination. The court then proceeded to assess both of these claims under the burden-shifting frame-work set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The district court determined that Ms. Merillat could not establish two elements of the *McDonnell Douglas* prima facie test: that she was performing her job to her employer's reasonable expectations and that similarly situated employees outside of the protected classes were treated more favorably than she.

With regard to her work performance, the court noted that Wiland's deposition testimony was that Ms. Merillat had failed to meet his expectations because: (1) she was unable "to entertain strategic concepts and manage new projects"; (2) she was "unable to adequately supervise subordinates"; (3) she "did not get along well with her co-workers"; and (4) she was "unwilling to implement a corporate-wide computer system." R.50 at 7 (citing Wiland Dep., R.35 at 16-17). The district court also determined that Metal Spinners' evaluations of Ms. Merillat from 2000-2002 confirmed Wiland's deposition testimony. Although the evaluations contained numerical ratings that indicated that Ms. Merillat was performing satisfactorily during those years, the court credited Metal Spinners' contention that the comments on those reviews "indicate that Merillat was performing marginally at best." *Id.* at 9.

The district court further explained that:

> If Merillat had simply been fired from her job in the absence of a RIF, then she might have been able to

argue that she was performing satisfactorily enough to not warrant being fired. But in this case she was not terminated for cause, but terminated due to reduction in force. This court agrees with Metal Spinners that what constitutes "satisfactory" work shifts a bit in a reduction in force case. Thus, while the record shows that Merillat was performing in the mid-range in some respects, the reviews also show that Merillat had some problems that concerned Metal Spinners enough that they were included in her evaluations. Thus, in this regard, the record supports Metal Spinners['] view that Merillat was a non-satisfactory performer.

*Id.*

Next, the district court examined the fourth prong of the traditional RIF *McDonnell Douglas* inquiry regarding the treatment of similarly situated employees not within the protected classes. Earlier in the opinion, the district court had noted that this circuit's precedent recognizes variations on the *McDonnell Douglas* analysis for a traditional RIF, where positions and duties are eliminated, and for what this court has called a "mini-RIF," where a discharged employee's duties are absorbed by other existing staff. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 493-95 (7th Cir. 2000); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011-12 & n.5 (7th Cir. 2000). Specifically, the district court noted that under the modified *McDonnell Douglas* test appropriate in a "mini-RIF" situation, the fourth prong of the plaintiff's prima facie case is satisfied when the plaintiff demonstrates that her duties were absorbed by persons not in the protected class. When actually applying the *McDonnell Douglas* test, however, the district court looked to whether Ms. Merillat presented anyone

similarly situated to her, an inquiry, which, as we have noted, is suited to the *McDonnell Douglas* test in a traditional RIF situation. *See Bellaver*, 200 F.3d at 494. Applying this test, the district court stated that Ms. Merillat failed to show that similarly situated, younger employees or similarly situated men were treated more favorably. *Id.* at 9. Although Ms. Merillat claimed that she and Wehr were similarly situated, the district court determined that they were not, based on its findings that Wehr was her supervisor and had more education and broader work experience than Ms. Merillat.

The district court also held that, even if Ms. Merillat had established a prima facie case, Metal Spinners had a legitimate, non-discriminatory reason for terminating her: The company was experiencing an economic downturn. The court noted that many of Ms. Merillat's tasks now could be done by the new Vantage computer system, making her a plausible candidate for termination to cut costs. Additionally, the court stated that her poor job performance was a separate legally sufficient reason for her discharge.

Finally, the district court turned to Ms. Merillat's EPA claim in which she alleged that she was paid less than Wehr because of her gender. Relying upon *Cullen v. Indiana University Board of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003), the district court stated that, in order to establish a prima facie case of an EPA violation, Ms. Merillat needed to show that her job and Wehr's job required comparable skill, effort and responsibility. The court then held the jobs did not require comparable "skills" because Wehr's job required him to "supervise the department and implement new strategies to improve supplier relationships," while Ms. Merillat's did not. *Id.* at 19. The court

also held that the jobs did not require equal "effort," because Wehr's added responsibilities "created more stress." *Id.* Finally, the court stated that the jobs did not require equal "responsibility," because Wehr had supervisory responsibility of the entire department, including Ms. Merillat. *Id.* Therefore, the district court held that Ms. Merillat could not establish a prima facie case of wage discrimination.

The district court further held that, if Ms. Merillat had established a prima facie case, the burden would shift to Metal Spinners to prove one of the statutory defenses, including that the unequal pay arose from a seniority system, a merit system, or any factor other than gender. *Id.* at 19-20. The court found that Wehr had more experience and education than Ms. Merillat, and that this distinction, along with market forces, provided a reason other than sex that justified paying Wehr a higher salary. The court characterized Ms. Merillat's response to Metal Spinners' proffered non-discriminatory reasons for the pay differential as "fatally weak," finding that she merely had relied on her own testimony that she and Wehr "performed a common core of tasks." *Id.* at 21. The court, therefore, found that Ms. Merillat's EPA claim "fails as a matter of law." *Id.* at 22.

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo, construing all facts and reasonable inferences in the light most favorable to Ms. Merillat, the non-moving party. *Healy v. City of Chicago*, 450 F.3d 732, 738 (7th Cir. 2006).

**A. Age and Sex Discrimination**

**1. Prima Facie Case**

Ms. Merillat submits that, employing the *McDonnell Douglas* framework, she has established a prima facie case of age and sex discrimination. *See McDonnell Douglas*, 411 U.S. 792. Although *McDonnell Douglas* itself outlined a particular four-part showing that a plaintiff must make to establish her prima facie case, we long have recognized that the test is not inflexible and is appropriately adapted where necessary to "reflect more fairly and accurately the underlying reality of the workplace." *Bellaver*, 200 F.3d at 494. In a mini-RIF context, a situation in which the dismissed worker's duties have been absorbed by another employee rather than eliminated, we employ one such modified version of the *McDonnell Douglas* framework. *Johal v. Little Lady Foods, Inc.*, 434 F.3d 943, 946 (7th Cir. 2006); *Paluck*, 221 F.3d at 1011 n.5. This approach requires that Ms. Merillat demonstrate that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) her duties were absorbed by employees not in the protected classes.[1] *Johal*, 434 F.3d at 946; *Michas v. Health Cost*

---

[1] The parties in this case presented arguments relating to the viability of any comparison group presented by Ms. Merillat to demonstrate that similarly situated individuals outside the protected class were treated more favorably than she. This showing *would be* part of a plaintiff's prima facie showing under a traditional RIF test. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 494 (7th Cir. 2000). In this case, however, since Ms. Merillat's

(continued...)

*Controls of Illinois*, 209 F.3d 687, 693 (7th Cir. 2000).

Metal Spinners does not dispute that Ms. Merillat is in a protected class with respect to both her age and her sex. Both parties also agree that Ms. Merillat suffered an adverse employment action when she was terminated. We therefore shall focus on the two contested prongs: whether Ms. Merillat was meeting her employer's legitimate expectations and whether her duties were absorbed by individuals not within her protected classes.

---

(...continued)

duties were absorbed rather than eliminated, it is more properly evaluated under the mini-RIF test. *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 n.5 (7th Cir. 2000) (stating that the key inquiry in determining whether to apply the RIF or the mini-RIF prima facie test is not the number of individuals terminated, but whether the duties of those individuals were absorbed by existing staff or eliminated altogether).

Although *Paluck*, a mini-RIF case, uses the "similarly situated" and "treated more favorably" language, our case law clarifies that this showing is satisfied in the mini-RIF context when a plaintiff demonstrates that the *duties* of the terminated worker have been absorbed by *retained* workers outside of the protected class. *See Bellaver*, 200 F.3d at 495 ("The plaintiff in a [mini-RIF] case does not need to make a showing that 'similarly situated' employees were treated better because the inference of discrimination arises from the fact that they were constructively 're-placed' by workers outside of the protected class."); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 693 (7th Cir. 2000) (same). The retention of an employee outside the protected class to perform the plaintiff's duties is nothing more than a demonstration of more favorable treatment, particularly tailored to the factual circumstances of a mini-RIF case.

### a. meeting legitimate expectations

Ms. Merillat contends that she was meeting her employer's expectations. She invites our attention to her yearly reviews for 2001 and 2002 in which Wiland's overall rating of her performance was "Satisfactory/Good." R.44, Ex.E-F. She also points to a letter that she received in January of 2003 that notes that she had been awarded a raise in her salary and that this adjustment in salary "recognize[d her] performance during the past year." R.44, Ex.L.

Metal Spinners relies on the same reviews. It submits that the written comments on those reviews indicate that Ms. Merillat was not meeting her employer's expectations. More specifically, Wiland testified in his deposition that Ms. Merillat did not meet his expectations for the following areas: ability to entertain strategic concepts and manage new projects, willingness to accept new challenges, ability to get along with others and willingness to implement a computer system. R.35 at 9-10.

The evaluations, while providing some negative comments, seem to be largely positive. In her 2001 evaluation, Ms. Merillat received an "excellent" rating in ten categories and "satisfactory/good" ratings in seventeen categories, with no categories rating below "satisfactory/good."[2] *See* R.36 at 14-15. Some comments included on the evaluations are positive, such as "Jan has made

---

[2] Some examples of the various categories on the evaluation form include: "Does the team member possess and apply the skill level necessary for the job?"; "Does the team member have a good attitude?"; and "Does the team member offer suggestions as to how to improve productivity?" R.36 at 14-15.

tremendous progress with areas previously noted for improvement," *id.* at 15, and, in the area of work habits, "[s]he is performing at a level commensurate with her position and she needs to continue developing personally as an effective manager," *id.* Some comments, however, are more negative, such as Ms. Merillat "may need to consider delegating additional tasks," *id.*, and she "needs to explore alternatives to her current methods and practices so cost improvements can be realized," *id.* at 14.

Similarly, in her 2002 evaluation, she received one "outstanding" rating, ten "excellent" ratings and sixteen "satisfactory/good" ratings, with no category rated lower than "satisfactory/good." *Id.* at 18-19. Again, there are some positive comments, such as Ms. Merillat "demonstrates continued improvement" in teamwork, *id.* at 18, and she "did an outstanding job of reducing raw materials inventories in 2002," *id.* There are also negative comments, such as she "has too many redundant/duplicative business practices that must be challenged," *id.*, and she must work on "developing rapport with coworkers and with improving her overall morale and demeanor," *id.* at 19.

Mr. Wiland stated in his deposition that he had attempted to make the written evaluations as fair as possible. He first admitted in his deposition testimony that he did not indicate "specifically" on these evaluations that Ms. Merillat was failing in her expectations, R.35 at 20, but later stated that "printed words [on the evaluation forms] in conjunction with [the conversation he had with Ms. Merillat while going over the forms with her] indicate that she was not fulfilling the expectations that we had for her at that position," *id.* at 23.

For her part, Ms. Merillat admitted to "getting ugly" with co-workers when they "didn't do something right," in 2001, but also stated that later she "changed." R.33 at 13-15. She contends that her job performance was largely posi- tive and that the reason for some of her failings was that she did not get the necessary computer upgrades and training to utilize the Vantage system and eliminate some of her redundant practices.

We must conclude that, based on this record, material issues of fact certainly remain with respect to whether Ms. Merillat was meeting her employer's expectations. Her employment evaluations are, at best, inconclusive. Additionally, she did receive a raise that stated it was based, in part, on her performance. Therefore, summary judgment for Metal Spinners on this prong would be inappropriate.

### b. duties absorbed by individuals outside the protected classes

There is agreement that a good deal of Ms. Merillat's responsibilities were assumed by Wehr, who is neither female nor within the protected age group. We therefore must conclude that Ms. Merillat has met this prong of the modified *McDonnell Douglas* test.

### 2. Pretext

If the plaintiff does establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. *See Johal*, 434 F.3d at 946. If the defendant does articulate such

reasons, the burden shifts back to the plaintiff to prove the proffered reasons were pretextual. *See id.*

In the present case, where there is a genuine issue of material fact with respect to whether Ms. Merillat was meeting expectations, Metal Spinners can prevail on its motion for summary judgment only if it can show that there remains a non-pretextual and non-discriminatory reason for her discharge. Metal Spinners offers several non-discriminatory reasons for terminating Ms. Merillat as part of its RIF: Many of her duties could be eliminated by the implementation of the Vantage computer system; she had a history of difficulty working with co-workers and suppliers; she had less desirable education and experience than Wehr and Wehr was more willing and better able to implement new strategies.

Ms. Merillat admits that many of her tasks are now performed by the Vantage computer system and therefore, at least one of the reasons given by Metal Spinners for her termination is not pretextual.[3] She nevertheless contends that Wehr has done a poor job because he has had inventory sitting idle for longer periods than she did when she was doing the metals purchasing. Ms. Merillat submits that Wehr's comparatively weaker performance demonstrates that Wiland was biased against her when he decided to terminate Ms. Merillat but to leave Wehr in his position. However, much of Ms. Merillat's explanation

---

[3] Ms. Merillat does argue that, while she was employed, she had requested that the Vantage system be upgraded to help eliminate her redundant work practices. *See* Appellant's Br. at 33. However, this does not negate the fact that the computer can now produce the reports that Ms. Merillat formerly produced, which is a fact that she admits. *See id.*

for Wehr's poor performance refers to his performance after her termination. Metal Spinners may have made a mistake in terminating Ms. Merillat rather than Wehr during the RIF. However, such information, even if proven to be true, would not be relevant to our present inquiry. Our only task is to determine whether Metal Spinners "honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish or trivial or even baseless." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999); *see also Balderston v. Fairbanks Morse Engine*, 328 F.3d 309, 323 (7th Cir. 2003) ("[A] plaintiff must do more than demonstrate that the employer made a mistake . . . ."). Even if Metal Spinners' decision was, in retrospect, a mistake, that conclusion, made with the benefit of hindsight, does not mean that Metal Spinners honestly did not believe that retaining Wehr and terminating Ms. Merillat was the appropriate decision at the time it was made. *See Johal*, 434 F.3d at 946 (stating that, when examining a claim of pretext, "it is not our role to question the wisdom of a company's decisions on how to run its business"); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.").

Ms. Merillat further submits that the district court created a new standard when it stated that "what constitutes 'satisfactory' work shifts a bit in a reduction in force case." Appellant's Br. at 25 (quoting R.50 at 9). However, when read in context, it is clear that the district court was only stating what we have already recognized: that, even if an employee would not have been fired under normal circumstances, "[i]n a reduction in force, some-

one has to go. It is usually the least qualified or least productive employee." *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573 (7th Cir. 1998). Even though, as noted above, Ms. Merillat's performance may have been satisfactory, it does not mean that her termination as part of a RIF was discriminatory. *See Balderston*, 328 F.3d at 324 (holding that the plaintiff did not demonstrate pretext when there was no evidence to show that the employer "did not honestly believe [it] was dismissing a poorer performing, less suitable" employee in a RIF).[4]

Relatedly, Ms. Merillat points out that, when Wiland told her that she was terminated, he told her it was due

---

[4] The record certainly contains evidence that supports Wiland's judgment in this respect. Ms. Merillat had only one year of post-high school education (a legal secretary degree) while Wehr had a bachelor's degree in business administration. Additionally, Ms. Merillat had no experience in the metal industry prior to working at Metal Spinners, while Wehr had previously overseen two other metal purchasing departments, had experience with new computer systems for metals purchasing and had significant contacts in the metal industry. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (finding that employees with different qualifications and experiences were not similarly situated); *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996) (holding that employee without relevant degree is not similarly situated to those with relevant degrees). Ms. Merillat attempts to counter these differences in education and experience by claiming that Wehr actually performed poorly at his job and had to be taught various skills by Ms. Merillat. However, such inadequacies by Wehr do not negate the fact that he has a different educational background and had different experiences from Ms. Merillat; therefore, he might well have been regarded as offering more potential to the company.

to "the poor performance of the company and economic softening in the marketplace." Wiland Dep., R.44, Ex.D-2 at 27. He admitted in his deposition testimony that he accurately represented to her the reasons for her termination.[5] *Id.* This statement is consistent with a termination under a RIF. Even if Ms. Merillat's performance was sufficiently acceptable to justify retaining her in better times, that consideration does not establish that Metal Spinners' reasons for terminating her in a RIF situation were pretextual. *See Fairchild*, 147 F.3d at 573. In a RIF, it is not pretextual to terminate an individual perceived to be a weak performer in an organization even if that individual's performance could also be characterized as satisfactory or adequate.

Next, Ms. Merillat contends that Wiland preferred to work with members of his social group and therefore chose a younger male colleague over Ms. Merillat. In support of this contention, Ms. Merillat points to the several occasions on which Wiland had lunch, drinks or dinner with Wehr, while he had never done any of the same with Ms. Merillat. However, in this context, socializing with someone who is not a member of a protected class does not demonstrate bias against those who are in a protected class. The fact that Wiland and Wehr had a more amiable social relationship is not enough to demonstrate that Wiland's reasons for terminating Ms. Merillat were pretextual and that he was actually motivated by age and/or sex discrimination. *See, e.g.*, *Pope v. ESA Servs.*,

---

[5] In fact, Ms. Merillat maintains that Wiland told her that her termination was not because of her job performance, and Wiland admitted in his deposition that it was "possible" that he told her that. R.44, Ex.D-2 at 23.

*Inc.*, 406 F.3d 1001, 1007-08 (8th Cir. 2005) (stating that the fact that a decision-maker went to lunch with white managers does not mean that his decision not to promote a minority employee was pretextual).

Finally, Ms. Merillat points to Wiland's request that she remove the cartoon lampooning the differences between male and female salaries that she had hanging on her bulletin board. Ms. Merillat argues that this incident is relevant to show bias toward women in the workplace. We have said, however, that isolated comments that are no more than "stray remarks" in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus. *See Cullen v. Olin Corp.*, 195 F.3d 317, 323 (7th Cir. 1999). We have cautioned that this general rule may give way where particular remarks in fact support an inference that unlawful bias motivated the decision-maker, such as when those remarks are made by the decision-maker or one having input in a decision, and are made "(1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Illinois*, 219 F.3d 649, 652-53 (7th Cir. 2000). Wiland's statement regarding the cartoon fits neither of those categories, nor does it otherwise demonstrate a bias on Wiland's part sufficient to support an inference of discriminatory animus. It is, therefore, clearly insufficient to sustain a determination that the reasons for the discharge stated by Wiland and supported by evidence were pretextual in nature.

Accordingly, we must conclude that although Ms. Merillat has demonstrated disputed material facts sufficient to prevent summary judgment for failure to meet her prima facie burden, Metal Spinners has proffered legitimate, non-discriminatory reasons to support her termina-

tion; in response, Ms. Merillat has not produced evidence sufficient to create a triable issue of fact with respect to her burden of demonstrating that those reasons are pretextual. Accordingly, we affirm the district court's grant of summary judgment in favor of Metal Spinners on Ms. Merillat's age and sex discrimination claims.

## B. Equal Pay Act

### 1. Prima Facie Case

In order to establish a prima facie case under the EPA, Ms. Merillat must show: "(1) higher wages were paid to a male employee, (2) for equal work requiring substantially similar skill, effort and responsibilities, and (3) the work was performed under similar working conditions." *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d at 698 (quoting *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 685 (7th Cir. 1998)). The parties do not dispute the first prong. Wehr's salary was $62,500; Ms. Merillat's salary was $49,800. R.29 at 1. With respect to the third prong, Ms. Merillat and Wehr worked together in the same office, and Metal Spinners does not argue that their work was not performed under similar working conditions. Therefore, only the second prong is at issue: whether Ms. Merillat and Wehr's positions required "substantially similar skill, effort and responsibilities."

In order to determine whether or not the two jobs are equal, we look to whether the jobs have a "common core of tasks, i.e., whether a significant portion of the two jobs is identical." *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d at 698 (internal quotation marks omitted). Once a plaintiff establishes a "common core" of tasks, we ask whether any additional tasks make the jobs "substantially different." *Id.*

When assessing job duties, each of the elements listed in the EPA (skill, effort and responsibilities) must be met individually to establish a prima facie case. *Id.*; *see also* 29 C.F.R. § 1620.14. We look to the actual job duties performed by each employee, not to his or her job description or title. *See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1461 (7th Cir. 1994).

Ms. Merillat asserts that she and Wehr had many of the same tasks, including: negotiating with suppliers, buying materials, and allocating materials for production. However, Metal Spinners submits that there are two areas in which Ms. Merillat and Wehr's job duties differed. These two differences, it asserts, make their respective jobs "substantially different" for purposes of the Equal Pay Act: (1) Wehr's responsibility for "strategic planning"; (2) Wehr's supervision of Ms. Merillat. We shall discuss each of these factors in turn.

Metal Spinners contends that part of Wehr's job duties included strategic planning, which it states required him to "implement new strategies to improve supplier relationships." Appellee's Br. at 43. Wehr also testified that his job duties included "establishing strong relationships with . . . suppliers." R.44, Ex.C-1 at 14. Ms. Merillat testified that, during the six months that she remained at Metal Spinners after the arrival of Wehr, she participated in this function because she "sat in on almost every meeting that [Wehr] had with the suppliers." R.44, Ex.H at 8. In his deposition, Wiland stated that, before Wehr was hired, Ms. Merillat was responsible for "obtaining cost effective purchasing and costing for our metals," and that she "was responsible for investigating alternative methods and practices that would improve the profitability of the company, specifically pertaining to [her responsibility in]

supplier relationships." R.35 at 8. Ms. Merillat testified that, after Wehr was hired, she continued to work to reduce the number of suppliers, as Wiland had requested. *See* R.33 at 5. She also stated that she continued to "negotiate with suppliers" after Wehr was hired. R.44, Ex.H at 20.

We believe that it is clear on the record as a whole that, with respect to strategic planning, Ms. Merillat's day-to-day duties with regard to suppliers did not change appreciably; she never assumed corporate-wide responsibility for the planning responsibilities placed on Wehr's shoulders upon his accepting the vice-presidential position at Metal Spinners. Thus, at the time his compensation was set, it was understood that he would handle significant responsibilities that had not been Ms. Merillat's. That Ms. Merillat did not see Wehr make significant contributions toward the achievement of those goals does not establish that the company's expectations with respect to Wehr's performance had changed.

Next, we turn to Wehr's supervisory duties. All parties agree that Wehr's job duties included functioning as Ms. Merillat's supervisor. *See* Wiland Dep., R.44, Ex.D-1 at 9; Merillat Dep., R.44, Ex.H at 7. Ms. Merillat also admitted, in her deposition, that Wehr had supervisory duties over the materials department employees. R.44, Ex.H at 2. She explained that Wehr, not she, had the authority to hire and fire employees, and that Stevenson would contact Wehr when she was calling in sick. *Id.* Stevenson, in her deposition, agreed that Wehr had become her direct supervisor when he was hired. R.37 at 4.

Wehr therefore had supervisory duties that Ms. Merillat did not exercise. Of course, as we have noted, not all differences in supervisory duty render two positions unequal for purposes of the EPA. *See Fallon v. State of*

*Illinois*, 882 F.2d 1206, 1209-10 (7th Cir. 1989). Indeed, there are some indications that Wehr's supervisory duties were, in actuality, minimal. Ms. Merillat submits that, although Wehr was supposed to function as her supervisor, in reality, she worked independently, and he did not supervise her. *See* Merillat Dep., R.44, Ex.H at 7 (stating, in response to a question regarding Wehr's supervisory duties with respect to her: "I pretty much work on my own. If he had questions, he would come and ask me. I was always there on time. I didn't call in sick.").

Ms. Merillat's 2002 evaluation lends some support to her contention that she continued to have a degree of supervisory authority over Stevenson. The evaluation states that, in 2003, Ms. Merillat must pursue "management" and "leadership" skills so that she may "effectively manage others on her staff." R.36, Ex.7 at 1. This statement seems to indicate that she was charged at least with supervising some of the duties of Stevenson, the only other materials department employee. Nevertheless, it is clear that, although neither had great supervisory authority over other personnel, Wehr did have more authority than Ms. Merillat.

We conclude that the record, fairly read in its totality, leads to the conclusion that Wehr and Ms. Merillat did not have equal levels of responsibility. "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). Ms. Merillat has therefore failed to establish a prima facie case under the Equal Pay Act.

## 2. Affirmative Defense

Assuming, *arguendo*, that Ms. Merillat has established a prima facie case, the burden would shift to Metal Spinners to establish one of four statutory defenses. *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d at 702. The statutory defenses occur when the rate of pay is determined "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." 29 U.S.C. § 206(d)(1). Metal Spinners submits that the fourth defense is applicable because the difference in pay between Wehr and Ms. Merillat was based on factors "other than sex." More specifically, Metal Spinners contends that the difference in pay was based, at least in part, on the difference between Wehr's and Ms. Merillat's educational background and industry-related experiences. Wehr held a bachelor's degree in business administration; Ms. Merillat had only a one-year legal secretary degree. Wehr had previous experience in the metal industry, had previously overseen two other purchasing departments and had experience implementing computer systems in metals purchasing. Ms. Merillat had not worked in the metals industry prior to her tenure at Metal Spinners. The record reveals, therefore, that there are real differences between the two employees' experience and education. Under the EPA, differences in education and experience may be considered factors other than sex. *See Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d at 702; *Dey*, 28 F.3d at 1462; *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1322 (9th Cir. 1994) ("Employers may reward professional experience and education without violating the EPA.").

Metal Spinners also submits that Wehr's salary was determined by market forces. Mr. Wiland noted that,

when he decided to create the position of Vice President of Procurement and Materials Management, he enlisted the help of a search firm and was informed that the market rate for such a position was $65,000-$75,000. Mr. Wiland also consulted trade journals to determine the appropriate market rate for such a position. We have held that an employer may take into account market forces when determining the salary of an employee. *See Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d at 703; *Stopka v. Alliance of American Insurers*, 141 F.3d 681, 687 (7th Cir. 1998) (accepting a difference in pay as based on a factor other than gender when motivated by "legitimate market forces").[6]

Metal Spinners has put forth evidence that the difference in pay was based on a factor other than sex; specifically, the difference was based on Wehr's education, his experience and the market forces at the time of his hire. Ms. Merillat has not put forth evidence to place the facts

---

[6] We recognize that we must be cautious when analyzing an employer's claim that "market forces" justify a higher salary, as companies may use such a theory "to justify lower wages for female employees simply because the market might bear such wages." *Taylor v. White*, 321 F.3d 710, 718 (8th Cir. 2003); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 205 (1974) (finding a violation of the EPA when a company "took advantage" of a "job market in which [the employer] could pay women less than men for the same work"); *Siler-Khodr v. Univ. of Texas Health Sci.*, 261 F.3d 542, 549 (5th Cir. 2001) (finding an employer's market forces argument "not tenable" when it "simply perpetuates the discrimination that Congress wanted to alleviate when it enacted the EPA"). The record does not support the inference that Metal Spinners took advantage of any kind of market forces that would permit different pay for a male and a female for the same position.

surrounding these stated rationales in dispute. Therefore, summary judgment also was appropriate based on Metal Spinners' affirmative defense of the pay differential being based on a "factor other than sex." *See* 29 U.S.C. § 206(d)(1)(iv).

### Conclusion

For the forgoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*